[No. S036423. June 22, 1995.]

CITY AND COUNTY OF SAN FRANCISCO, Plaintiff and Appellant, v. COUNTY OF SAN MATEO et al., Defendants and Respondents.

CITY AND COUNTY OF SAN FRANCISCO, Plaintiff and Appellant, v. COUNTY OF ALAMEDA et al., Defendants and Respondents.

556

**COUNSEL**

Louise H. Renne, City Attorney, Dennis Aftergut, Chief Assistant City Attorney, and Claude F. Kolm, Deputy City Attorney, for Plaintiff and Appellant.

James K. Hahn, City Attorney (Los Angeles), Gary R. Netzer, Richard Helgeson and Breton K. Lobner, Assistant City Attorneys, Robert M. Myers, City Attorney (Santa Monica), Linda Mills-Coyne, Deputy City Attorney, John W. Witt, City Attorney (San Diego), Harold O. Valderhaug, Chief Deputy City Attorney, John J. Doherty, Susan D. Hatfield and Sydney B. Bennion as Amici Curiae on behalf of Plaintiff and Appellant.

Thomas F. Casey III, County Counsel (San Mateo), Mary K. Raftery, Deputy County Counsel, Kelvin H. Booty, Jr., County Counsel (Alameda) and James F. May, Assistant County Counsel, for Defendants and Respondents.

De Witt W. Clinton, County Counsel (Los Angeles), Albert Ramseyer, Deputy County Counsel, Jim Reed, County Counsel (Mono), Neil McCarroll, Assistant County Counsel, Paul N. Bruce, County Counsel (Inyo) and Gregory L. James as Amici Curiae on behalf of Defendants and Respondents.

## OPINION

**KENNARD, J.**—This case presents the question of whether a local government that owns land located outside of its jurisdictional boundaries may invoke the valuation limitation of Proposition 13, article XIII A of the California Constitution, to limit the taxes imposed on its land, or whether instead its land may be valued in excess of the limits of article XIII A and subject only to the limits set by another constitutional provision that addresses the taxation of local government lands, article XIII, section 11 of the California Constitution.[1] We conclude for the reasons stated below that the valuation limitations of article XIII A apply to taxable lands owned by the City and County of San Francisco that are located in the Counties of San Mateo and Alameda, and that the application of article XIII A's valuation limitations to San Francisco's lands does not conflict with section 11 of article XIII. Accordingly, we reverse the judgment of the Court of Appeal.

I

Before 1914, land owned by a local government and located outside of its jurisdictional boundaries was constitutionally exempt from taxation by the local government within whose boundaries the land was located. (Former art. XIII, § 1.) As urban governments went farther afield in their search for water in the early years of this century, they began to acquire significant landholdings in other counties. This land was acquired for its water rights and for use in constructing water storage and transportation facilities. The City of Los Angeles, for example, acquired large amounts of land in Mono and Inyo Counties. (See generally, Reisner, Cadillac Desert (1986) pp. 62-72, 104.) Counties like Mono and Inyo accordingly saw their tax bases shrink.

The adverse effect on the tax bases of the counties in which such land was located led in 1914 to the amendment of article XIII, section 1 in our state Constitution to permit the taxation of land owned by local governments and located outside their jurisdictional boundaries. "[T]he amendment was proposed to protect from loss those counties into which municipalities might go

---

[1]All further references to articles are to the California Constitution.

for the purpose of constructing waterworks for supplying their inhabitants with water. [The ballot pamphlet] referred specifically to Los Angeles and San Francisco, which cities had already acquired large bodies of land situated in the counties of Tuolumne, Mono, and Inyo as parts of their respective water systems, the result of which, under the constitution as it previously stood, was to exempt from taxation large and valuable properties within said counties and thereby deplete the revenues of such counties." (*Pasadena* v. *County of Los Angeles* (1920) 182 Cal. 171, 174 [187 P. 418].) The 1914 amendment made taxable "such lands . . . located outside of the county, city and county or municipal corporation owning the same as were subject to taxation at the time of acquisition of the same . . . ." (Former art. XIII, § 1.)

The amount of ad valorem tax paid on a parcel of real property is the product of two factors: the valuation of the real property and the tax rate applied to that valuation. In 1968, the California Constitution was amended by the voters to limit the maximum valuation by the taxing counties of taxable land owned by a local government and located outside of its boundaries. (Former article XIII, §§ 1.60 to 1.69.) In 1974, these valuation limitations were moved to article XIII, section 11. Section 11 limits the taxation of taxable land owned by a local government and located outside its jurisdictional boundaries (hereafter sometimes referred to as extraterritorial land) by restricting the maximum valuation of that land. (Art. XIII, § 11, subd. (b).) Section 11, however, does not limit the tax rate imposed on extraterritorial lands.

The City and County of San Francisco (hereafter San Francisco) owns lands in San Mateo and Alameda Counties (hereafter San Mateo and Alameda). San Francisco acquired these lands before 1967. For extraterritorial lands located outside of Mono and Inyo Counties, such as San Francisco's lands at issue here, section 11 sets forth two alternative limitations on the assessed value of extraterritorial lands and requires that the assessed value of a parcel of extraterritorial land not exceed the lower of the two limitations.[2]

Specifically, section 11 requires that those lands be assessed "in an amount that *does not exceed* the lower of (1) its fair market value times the

---

[2]Section 11 contains provisions for the valuation and taxation of extraterritorial lands located in Mono or Inyo County that are different from the provisions governing valuation and taxation of extraterritorial lands located elsewhere in California. (§ 11, subds. (a) & (b).) This case does not raise the issue of whether or to what extent article XIII A applies to extraterritorial lands located in Mono or Inyo County in light of the special provisions of section 11 regarding those lands. We express no views on that issue.

Additionally, section 11 addresses the taxation of improvements owned by a local government and located outside its boundaries. (§ 11, subds. (a) & (d).) This case raises no issue regarding the taxation of such improvements, and we express no views on the matter.

prevailing percentage of fair market value at which other lands are assessed and (2) a figure derived [by multiplying the property's 1967 assessed value by the ratio of the statewide per capita assessed value of land as of the last lien date prior to the current lien date to $856]." (§ 11, subd. (b), italics added.) The ratio of the statewide per capita assessed value of land to $856 is known as the Phillips factor, and it reflects the statewide increase in land values since 1967. Before 1978, San Mateo and Alameda taxed San Francisco's lands according to the valuation limitations set forth in section 11.

In 1978, the voters adopted Proposition 13, which became article XIII A of the California Constitution. Article XIII A limits both the valuation of real property for tax purposes and the maximum tax rate that can be imposed on the resulting real property valuation. It limits the valuation of real property owned since the 1975 assessment date to the 1975-1976 "full cash value" of the property, increased for inflation by a maximum of 2 percent annually. (Art. XIII A, § 2, subds. (a) & (b).) It limits the maximum tax rate to 1 percent. (*Id.*, § 1, subd. (a).) Article XIII A does not expressly repeal or modify section 11.

In the 1978-1979 tax year, the first tax year after article XIII A's adoption, the State Board of Equalization advised all county assessors that the valuation limitation of article XIII A applied to extraterritorial lands. For the 1978-1979 tax year, San Mateo and Alameda adopted this position and valued San Francisco's lands by taking the 1975-1976 valuation of those lands under section 11 and increasing it by the 2 percent annual valuation limitation of article XIII A.

The State Board of Equalization later changed its position and concluded that article XIII A did not limit the valuation of extraterritorial lands. San Mateo adopted this interpretation beginning with the 1979-1980 tax year; Alameda adopted it beginning with the 1980-1981 tax year. Accordingly, since the 1980-1981 tax year, San Mateo and Alameda have taxed lands that are within their boundaries but owned by San Francisco according to the limits of section 11 without applying the valuation limitation of article XIII A.

San Francisco objected to the refusal of San Mateo and Alameda to apply the valuation limitation of article XIII A to the taxation of its lands in those counties, and on that ground filed claims with Alameda and San Mateo for partial refund of its taxes. In this regard, San Francisco also filed petitions for equalization with the State Board of Equalization. The board denied the petitions.

Thereafter, San Francisco filed actions in Marin County Superior Court against San Mateo and against Alameda seeking partial refund of the property taxes assessed against San Francisco for the tax years 1980-1981 through 1988-1989.[3] The trial court consolidated the actions, which were then tried to the court. The trial court ruled that the valuation limitation of article XIII A did not apply to San Francisco's lands because to do so would conflict with section 11.

San Francisco appealed the trial court's judgment. The Court of Appeal agreed with the trial court that there was an irreconcilable conflict between section 11 and article XIII A with respect to the valuation of extraterritorial lands. It concluded that in light of this conflict, only the valuation limitations of section 11 should apply to extraterritorial lands because article XIII A did not impliedly repeal section 11 and because section 11, as a provision specifically addressing extraterritorial lands, should prevail over the more general valuation limitation of article XIII A. One justice dissented, concluding that article XIII A and section 11 did not conflict with each other and could be applied harmoniously to San Francisco's extraterritorial lands.

We granted review to decide whether the valuation limitation of article XIII A applies to taxable lands owned by a local government but located outside its boundaries.

## II

In addressing the question of whether article XIII A's valuation limitation applies to land owned by a local government and located outside its boundaries, our task is to effectuate the voters' intent in adopting article XIII A. (*Hill* v. *National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 17 [26 Cal.Rptr.2d 834, 865 P.2d 633]; *Board of Supervisors* v. *Lonergan* (1980) 27 Cal.3d 855, 863 [167 Cal.Rptr. 820, 616 P.2d 802].) In performing this task, we are guided by familiar principles. ■ A constitutional provision should be construed according to the natural and ordinary meaning of its words. (*ITT World Communications, Inc.* v. *City and County of San Francisco*

---

[3]Under Code of Civil Procedure section 394, subdivision (a), an action brought by a city and county against another county "may be tried in any county, or city and county, not a party thereto."

In the trial court, San Mateo contested whether San Francisco had filed a timely claim for refund for taxes paid to San Mateo for the 1981-1982 tax year; in addition, both Alameda and San Mateo contended that San Francisco failed to exhaust its administrative remedies with the State Board of Equalization for taxes paid to both counties for the 1984-1985 tax year. Because the trial court concluded that article XIII A had no application to extraterritorial lands, it had no occasion to address these issues. We leave it to the trial court to address these contentions in the first instance on remand.

(1985) 37 Cal.3d 859, 865 [210 Cal.Rptr. 226, 693 P.2d 811].) If the provision's words are ambiguous and open to more than one meaning, we consult the legislative history, which in the case of article XIII A is the ballot pamphlet. (*Board of Supervisors* v. *Lonergan, supra*, at p. 866.) In cases of ambiguity we also may consult any contemporaneous constructions of the constitutional provision made by the Legislature or by administrative agencies. (*Ibid.*)

In choosing between alternative interpretations of constitutional provisions we are further constrained by our duty to harmonize various constitutional provisions (*Serrano* v. *Priest* (1971) 5 Cal.3d 584, 596 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187]) in order to avoid the implied repeal of one provision by another. Implied repeals are disfavored. (*Board of Supervisors* v. *Lonergan, supra*, 27 Cal.3d at p. 868.) "So strong is the presumption against implied repeals" that we will conclude one constitutional provision impliedly repeals another only when the more recently enacted of two provisions constitutes a revision of the entire subject addressed by the provisions. (*Board of Supervisors* v. *Lonergan, supra*, 27 Cal.3d at p. 868; see also *Western Oil & Gas Assn.* v. *Monterey Bay Unified Air Pollution Control Dist.* (1989) 49 Cal.3d 408, 419-420 [261 Cal.Rptr. 384, 777 P.2d 157].) In the case of article XIII A (the more recently enacted constitutional provision here), we have previously concluded that it "does not constitute a revision of the entire subject of taxation, but merely amends the Constitution on certain aspects of the subject of real property taxation." (*ITT World Communications, Inc.* v. *City and County of San Francisco, supra*, 37 Cal.3d at p. 866.) Thus, as between an interpretation of article XIII A and section 11 that results in a conflict between the two provisions, requiring us to choose one over the other, and an interpretation that harmonizes them, "we are bound to harmonize the two constitutional provisions." (*Board of Supervisors* v. *Lonergan, supra*, at p. 869.)

### III

Initially, we must determine whether by its own terms article XIII A excludes from its valuation limitation land owned by a local government and located outside its boundaries. (See *Board of Supervisors* v. *Lonergan, supra*, 27 Cal.3d at p. 863 [before determining whether article XIII A conflicted with article XIII, section 12's provisions for the taxation of property on the 1978-1979 unsecured rolls, it was necessary first to determine whether the scope of article XIII A extended to property on the 1978-1979 unsecured rolls].) If article XIII A excludes land owned by local governments, then article XIII A and section 11 cannot conflict, because

section 11 applies only to land owned by local governments. (See *Board of Supervisors* v. *Lonergan, supra*, at p. 863.)

Article XIII A does not expressly exclude any class of real property from its scope.[4] Instead, it states: "The maximum amount of any ad valorem tax on real property shall not exceed One percent (1%) of the full cash value of such property." (Art. XIII A, § 1, subd. (a).) Nevertheless, San Mateo and Alameda argue that article XIII A, by its use of the term "full cash value," implicitly excludes from its valuation limitation land owned by local governments that before the enactment of article XIII A was subject to the valuation limitations of section 11. They contend that "full cash value" means only fair market value, and that by referring to "full cash value" article XIII A limits its scope of operation to real property whose method of valuation prior to article XIII A was fair market value.

Contrary to the views of San Mateo and Alameda, however, the term "full cash value" as defined in article XIII A encompasses San Francisco's lands at issue in this case, lands that in the 1975-1976 tax year were valued by San Mateo and Alameda for tax purposes under section 11. Article XIII A first uses the term "full cash value" in section 1, subdivision (a), where it states: "The maximum amount of any ad valorem tax on real property shall not exceed One percent (1%) of the full cash value of such property." (Art. XIII A, § 1, subd. (a).) Section 2, subdivision (a) then defines "full cash value" as follows: "The full cash value means the county assessor's valuation of real property as shown on the 1975-76 tax bill under 'full cash value' or, thereafter, the appraised value of real property when purchased, newly constructed, or a change in ownership has occurred after the 1975 assessment. All real property not already assessed up to the 1975-76 full cash value may be reassessed to reflect that valuation." (Art. XIII A, § 2, subd. (a).)

---

[4]The relevant portions of article XIII A are these:

"(a) The maximum amount of any ad valorem tax on real property shall not exceed One percent (1%) of the full cash value of such property. . . ." (Art. XIII A, § 1.)

"(a) The full cash value means the county assessor's valuation of real property as shown on the 1975-76 tax bill under 'full cash value' or, thereafter, the appraised value of real property when purchased, newly constructed, or a change in ownership has occurred after the 1975 assessment. All real property not already assessed up to the 1975-76 full cash value may be reassessed to reflect that valuation. . . .

"  . . . . . . . . . . . . . . . . . . . . . . . . .

"(b) The full cash value base may reflect from year to year the inflationary rate not to exceed 2 percent for any given year or reduction as shown in the consumer price index or comparable data for the area under taxing jurisdiction, or may be reduced to reflect substantial damage, destruction or other factors causing a decline in value." (Art. XIII A, § 2.)

The argument of San Mateo and Alameda that article XIII A's use of the term "full cash value" excludes property owned by local governments fails for two reasons.

First, section 2, subdivision (a) of article XIII A expressly defines "full cash value," and that definition on its face is not limited to fair market value.[5] The definition of "full cash value" in article XIII A is in two parts. Section 2, subdivision (a) defines "full cash value" for property owned continuously since the 1975 assessment as "the county assessor's valuation" as stated on the 1975-1976 tax bill under the heading " 'full cash value.' " On its face, the term "county assessor's valuation as shown on the 1975-76 tax bill under 'full cash value' " means any valuation made by the county assessor for purposes of taxation that appears on the 1975-1976 tax bill for the property in question, regardless of the method used by the assessor to calculate the valuation. "Full cash value" as used in article XIII A thus encompasses not only valuations based on fair market value but those based on other methods such as the valuation limitations of section 11.

We have previously held that the phrase "county assessor's valuation" in article XIII A should be construed according to its plain meaning. In *ITT World Communications, Inc.* v. *City and County of San Francisco, supra,* 37 Cal.3d at pages 866-867, we concluded that, because no "county assessor's valuation" occurs in the case of state-assessed property such as public utility property, article XIII A does not apply to state-assessed property. It is consistent with our decision in *ITT World Communications* to likewise interpret "county assessor's valuation" in this case according to its plain meaning.

For property not owned continuously by the same owner since 1975, section 2, subdivision (a) of article XIII A defines "full cash value" as the "appraised value" at the time that the property is purchased, newly constructed, or subject to a change in ownership, not as its "fair market value"

[5]Part of the confusion over the meaning of "full cash value" as used in article XIII A arises from the fact that, before the adoption of article XIII A, the term "full cash value" had been used to mean fair market value. (See Rev. & Tax. Code, § 110, subd. (a) [". . . 'full cash value' or 'fair market value' means the amount of cash or its equivalent which property would bring if exposed for sale in the open market . . . ."].) By contrast, article XIII, section 1, adopted in 1974, defined the term "full value" to include both fair market value and other standards of valuation prescribed by the Constitution or statute. (Art. XIII, § 1, subd. (a) ["When a value standard other than fair market value is prescribed by this Constitution, . . . the same percentage shall be applied to determine the assessed value. The value to which the percentage is applied, whether it be the fair market value or not, shall be known for property tax purposes as the *full value.*" (Italics added.)].) As will be seen, Article XIII A gave the term "full cash value" a meaning that is closer to "full value" than it is to "fair market value."

at the time of the triggering event. The plain meaning of "appraised value" is broader than "fair market value"; like "county assessor's valuation," "appraised value" describes a number, and not the method of valuation used to calculate the number. A valuation made by the assessor applying the valuation limitations of section 11 is an "appraised value." (See Rev. & Tax. Code, § 405.5 [assessor's determination of a property's restricted value is an appraisal].) Accordingly, section 2, subdivision (a)'s definition of "full cash value" as "appraised value" encompasses extraterritorial land valued under section 11 because such a valuation is an "appraised value."

The second reason why "full cash value" as used in article XIII A does not exclude extraterritorial land subject to section 11 is that even for residential homes and other real property indisputably within the scope of article XIII A, the term "full cash value" as used in article XIII A is not synonymous with fair market value. ■ As we recognized in *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 236 [149 Cal.Rptr. 239, 583 P.2d 1281], article XIII A's full cash value valuation limitation is " 'a value standard other than fair market value.' " Under article XIII A, the only time full cash value equals fair market value is in the year when real property subject to appraisal at fair market value is first purchased, newly constructed, or otherwise changes ownership. Thereafter, the full cash value of the property increases according to the rate of inflation (to a maximum of 2 percent per year), and not according to the increase in fair market value. For example, the 1995 full cash value of a house purchased before 1975 is neither its fair market value in 1995, nor its fair market value in any other year, but is an amount that does not exceed the house's 1975 fair market value increased by 2 percent compounded annually for each year from 1978 to 1995.

■ In fact, the "full cash value" valuation method of article XIII A as applied to residential homes is similar to the "Phillips factor" valuation limitation of section 11 for lands owned by local governments and located outside their boundaries.[6] Each begins with an appraised fair market value for a specific year (under article XIII A, the year 1975 for homes owned continuously since then; under section 11, the year 1967 for extraterritorial lands outside Mono and Inyo Counties). Each then, however, limits increases in valuation in subsequent years according to a formula that is independent of the actual increase in fair market value for the property in question. This similarity is further evidence that the term "full cash value" as used in article XIII A encompasses both properties whose initial full cash value is determined by fair market value and properties whose initial full cash value is determined by some other method of valuation.

---

[6]The Phillips factor valuation limitation of section 11 is discussed at page 561, *ante.*

## IV

Having concluded that article XIII A does not exclude taxable lands owned by local governments and located outside their boundaries, we must next consider whether both that provision and section 11 may be applied to those lands without conflicting. Article XIII A does not expressly repeal or modify section 11. As we have discussed, one constitutional provision "should not be construed to effect the implied repeal of another constitutional provision." (*ITT World Communications, Inc.* v. *City and County of San Francisco, supra,* 37 Cal.3d at p. 865.) Accordingly, if the two provisions can be construed to apply concurrently, we must do so. (See *Board of Supervisors* v. *Lonergan, supra,* 27 Cal.3d at p. 868.) Only if they are in *irreconcilable* conflict must we decide which constitutional provision prevails. For the reasons stated below, we conclude that article XIII A and section 11 may be applied together without conflicting.

On their faces, article XIII A and section 11 do not present any irreconcilable conflict. Section 11 only sets an upper limit on the valuation for tax purposes of property owned by local governments. In the case of extraterritorial lands outside of Mono and Inyo Counties, such as the lands owned by San Francisco at issue here, it limits the maximum assessment of extraterritorial land to "an amount that *does not exceed* the lower of (1) its fair market value times the prevailing percentage of fair market value at which other lands are assessed and (2) a figure derived [by multiplying the property's 1967 assessed value by the ratio of the statewide per capita assessed value of land as of the last lien date prior to the current lien date to $856]." (§ 11, subd. (b), italics added.) Article XIII A, too, only sets an upper limit on the valuation and taxation of real property, requiring that the "*maximum* amount of any ad valorem tax on real property *shall not exceed* One percent (1%) of the full cash value of such property." (Art. XIII A, § 1, subd. (a), italics added.)

Nor do the two provisions conflict in their application. Under article XIII A, the "full cash value" of San Francisco's lands in San Mateo and Alameda would be determined by starting with their valuation under section 11 for the 1975-1976 tax year (which is the "county assessor's valuation" for that tax year), and increasing it by the rate of inflation to a maximum of 2 percent per year. If the application of article XIII A results in a "full cash value" for San Francisco's property that is lower than either of the two alternative valuation limitations of section 11, using the valuation of article XIII A does not conflict with section 11 because the article XIII A valuation "does not exceed the lower of" (§ 11) the two alternative valuation limitations. Similarly, if one or both of the alternative valuation limitations of section 11 are

lower than the article XIII A valuation, it does not conflict with article XIII A to use the lower section 11 valuation because the valuation limitation of article XIII A is only a ceiling.

Article XIII A and section 11 can therefore operate concurrently to determine the valuation of extraterritorial lands for tax purposes. Section 11 does not mandate a valuation of extraterritorial lands that article XIII A prohibits, nor vice versa. Thus, there is no irreconcilable conflict between the valuation limitations imposed by each.

Nor is there any conflict between the purpose of section 11 and the purpose of article XIII A. The constitutional provision that is now section 11 has its origins in former article XIII, sections 1.60 to 1.69, adopted in 1968. Before the adoption of former article XIII, section 1.60 et seq., extraterritorial lands were taxable and were valued for taxation at fair market value. (See former art. XIII, § 1.) In a number of cases, however, these extraterritorial lands were difficult to value because of their uniqueness (e.g., water rights and watershed land in the Sierra) and the lack of transactions for comparable land in the open market. (See Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to the voters, Gen. Elec. (Nov. 5, 1968), argument of Sen. Moscone in favor of Prop. 2, p. 7 ["[U]nlike private property there is no fair, agreed upon method of assessing such land and water rights. Such property is unique. Actual sales against which to measure fair market values are virtually non-existent."].) Moreover, populous urban local governments owning property outside their boundaries in some cases apparently came to believe that the taxing counties were overvaluing that land in order to exploit a distant deep-pocket taxpayer which had no vote in the county and which, because of the uniqueness of its land, was unlikely to sell its land and relocate. (See *id.*, argument of Sen. Cologne in favor of Prop. 2, p. 7 ["Disagreement on the amount of the assessed value of such lands and water rights, against which taxes are levied, has resulted in prolonged and costly court battles between public agencies."].)

The purpose of former article XIII, section 1.60 et seq. was to ensure that land owned by local governments and located outside their boundaries would be taxed comparably to privately owned land, both from the perspective of the local government that owned the land and from the perspective of the local government in whose taxing jurisdiction the land was located. In the words of one of the ballot arguments in favor of section 1.60 et seq.: "This measure will assure continuance of an adequate tax base related to these lands. It will also assure public agencies owning the property that their citizens will not bear more than an equitable share of taxes levied in the

taxing counties. [¶] Equity in taxation is a basic goal for all of us. No one should bear his unjust tax share. [¶] This amendment is a protection of that principle." (Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to the voters, Gen. Elec. (Nov. 5, 1968), argument of Sen. Moscone in favor of Prop. 2, p. 7.)

The proponents of former article XIII, section 1.60 et seq. sought to preserve fair market value, the valuation method used at that time for privately owned property, as the underlying basis for valuing government lands while concluding that the ordinary methods for determining fair market value were not producing accurate and undisputed valuations of lands owned by local governments. Section 1.60 imposed valuation limitations on extraterritorial lands to prevent the taxing county from manipulating fair market value while insuring that the valuation of extraterritorial lands would continue to grow in line with the general statewide appreciation of land values in California.

■ Section 11, adopted by the voters in 1974, continued these principles unchanged. It transferred former article XIII, sections 1.60 through 1.69 with minor modifications to a new section 11. (See Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to the voters, Gen. Elec. (Nov. 5, 1974), argument in favor of Prop. 8, p. 31 [Proposition 8 "makes only technical changes in the Constitution and clarifies the meaning of existing sections. [¶] . . . [¶] The purpose of this amendment is not to make a change in our present tax structure, but to make the Constitution more readable and workable."].)

Section 11 continued the purpose of ensuring comparable taxation of extraterritorial lands and privately owned real property. Significantly, a local government's extraterritorial lands could never be valued higher under section 11 than those same lands would be valued if owned by a private landowner. As had section 1.60 of former article XIII, section 11 limits valuation of extraterritorial lands located outside of Mono and Inyo Counties, such as the lands at issue in this case, to the lower of either the fair market value as assessed by the taxing county or the 1967 assessed value times the Phillips factor reflecting the general increase in land values in California since 1967.

■ Article XIII A's purpose was to restrict the taxation of real property generally by limiting the growth in valuation of real property and by limiting the maximum tax rate imposed on real property. (*Board of Supervisors* v. *Lonergan, supra,* 27 Cal.3d at p. 863 [article XIII A "pertain[s] to the subject

of *real property* taxation and . . . its underlying purpose and chief aim [is] *real property* tax relief" (italics in original)].) The valuation and tax rate limitations of article XIII A apply to "*any* ad valorem tax on real property." (Art. XIII A, § 1, subd. (a), italics added.) Like the language of article XIII A itself, the ballot pamphlet also indicates that article XIII A applies to taxable real property generally. (See Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to the voters, Gen. Elec. (June 6, 1978), Legislative Analyst's analysis of Prop. 13, p. 56 ["This initiative would . . . restrict the growth in the assessed value of property subject to taxation . . . ."]; *id.*, argument of Jarvis and Gann in favor of Prop. 13, p. 58 ["It will help farmers and keep business in California."]; *id.*, rebuttal by Flournoy et al. to argument in favor of Prop. 13, p. 59 ["GIVES nearly two-thirds of the tax relief to BUSINESS, INDUSTRIAL property owners and apartment house LANDLORDS."].)

■ It is thus consistent with article XIII A's purpose of limiting real property taxation generally to apply its valuation limitation to extraterritorial lands in addition to other types of real property. It is likewise consistent with section 11's purpose of taxing extraterritorial lands comparably to other taxable real property to apply article XIII A to extraterritorial lands as well as to other types of real property. Applying article XIII A to taxable lands owned by local governments and located outside their boundaries thus gives the fullest possible effect to both article XIII A and section 11.

By contrast, to refuse to apply article XIII A to extraterritorial lands would be contrary to section 11's purpose of ensuring that a local government's extraterritorial lands not be valued greater than the same lands would be valued if owned by a private landowner. If article XIII A did not apply to a local government's extraterritorial lands, the section 11 valuation of a parcel of extraterritorial land could exceed the valuation that the same land would have had if owned by a private landowner and valued under article XIII A.[7]

In light of the strong presumption against implied repeal and our duty to harmonize constitutional provisions wherever possible, we thus conclude

---

[7]This would be true even if the 1975-1976 valuation under section 11 of the extraterritorial land was less than fair market value. It was the testimony at trial that from 1975 to 1988 the Phillips factor increased at an average annual rate of 8.37 percent. Growth in valuation under article XIII A, of course, is limited to a maximum annual increase of 2 percent. Because of the magnitude of this growth rate differential, even extraterritorial land that in 1975-1976 was valued under section 11's Phillips factor method at less than fair market value could eventually have a section 11 valuation greater than the article XIII A valuation of the same land starting from fair market value in 1975-1976.

there is no irreconcilable conflict between section 11 and article XIII A that would preclude their concurrent application.[8] Accordingly, we must apply them concurrently to taxable land owned by a local government and located outside its boundaries. (See *Board of Supervisors* v. *Lonergan, supra*, 27 Cal.3d at p. 868.) For that reason, the valuation limitation of article XIII A applies to local government lands located in counties other than Mono and Inyo.[9]

## V

Because of our conclusions that by its plain language article XIII A encompasses taxable real property owned by local governments and that article XIII A does not conflict with section 11, it is unnecessary to consult contemporaneous constructions by administrative agencies or the Legislature to clarify the scope of article XIII A. (*Board of Supervisors* v. *Lonergan, supra*, 27 Cal.3d at p. 866.) In any event, as discussed below, resort to such sources does not undermine the conclusion that article XIII A operates in conjunction with section 11 to limit the valuation of extraterritorial lands.

The State Board of Equalization's instructions to county assessors regarding the application of article XIII A to extraterritorial lands have been contradictory. The board initially took the position, consistent with our holding in this case, that the taxable valuation was the lowest of the possible valuations under article XIII A and section 11. (State Board of Equalization, Letter No. 79/40 to County Assessors (Feb. 27, 1979).) It informed county assessors accordingly in February 1979.

Subsequently, however, after the enactment of Revenue and Taxation Code section 52, subdivision (d) (discussed below), the State Board of Equalization reversed its position, and then partially reversed it again. In October 1979, the board took the position that in light of section 52, subdivision (d), article XIII A did not apply to either extraterritorial land or taxable improvements on extraterritorial land. (State Board of Equalization,

---

[8]The concurring opinion concludes to the contrary that article XIII A did impliedly repeal section 11. The concurring opinion argues that, were we construing a *statute* that limited property taxation in a manner similar to article XIII A, we would conclude that such a statute conflicted with section 11. This argument, however, ignores that our task here is not to determine whether a statute conflicts with a paramount constitutional provision, but rather whether there is any possible construction that will harmonize two constitutional provisions of equal dignity. As we demonstrate in the text, a harmonious construction of the two provisions does exist and we therefore must adopt that harmonizing construction.

[9]As stated in footnote 2 above, we express no view on the application of article XIII A to extraterritorial lands located in Mono or Inyo County because of section 11's unique provisions applying to those lands.

Letter No. 79/187 to County Assessors (Oct. 19, 1979).) In December 1982, the board partially reversed this position, concluding that article XIII A did not apply to extraterritorial land but did apply to taxable improvements on extraterritorial land. (State Board of Equalization, Letter No. 82/136 to County Assessors (Dec. 7, 1982).)

Because at different times the State Board of Equalization has taken inconsistent positions, its self-contradictory views are not of assistance to us in resolving the question of the application of article XIII A to extraterritorial lands. ■ Moreover, as discussed below, subdivision (d) of Revenue and Taxation Code section 52 does not prohibit the application of article XIII A to extraterritorial lands; therefore, the board's reliance on subdivision (d) as the basis for reversing its position was ill-founded.

Subdivision (d) of Revenue and Taxation Code section 52 was enacted by the Legislature in 1979. (Stats. 1979, ch. 242, § 4, p. 506.) It makes no mention of article XIII A or article XIII A's effect on extraterritorial lands. In its entirety, it reads: "Notwithstanding the provisions of this division, property subject to valuation pursuant to Section 11 of Article XIII of the California Constitution shall be valued for property tax purposes in accordance with such section." (Rev. & Tax. Code, § 52, subd. (d).) As discussed above, section 11 only sets a ceiling for the valuation of extraterritorial lands that the taxing body cannot exceed. Any valuation below the limits set by section 11 thus accords with section 11. Moreover, section 11 was the basis for the valuation of extraterritorial lands in the 1975-1976 tax year. It accords with section 11 to use the 1975-1976 valuation determined under section 11 as the "county assessor's valuation" under article XIII A, section 2, subdivision (a) for purposes of determining the full cash value of San Francisco's lands. The application of article XIII A's valuation limitation to the 1975-1976 valuation under section 11 of San Francisco's lands to result in a valuation for 1978-1979 and subsequent years that does not exceed the ceiling set by section 11 is therefore "in accordance with" section 11. Had the Legislature instead wished to state that in its view article XIII A had no application to extraterritorial lands subject to section 11, it could have easily and clearly done so.[10]

■ Finally, San Mateo and Alameda rely on subdivision (a) of Revenue and Taxation Code section 110.1, which defines "full cash value" as fair

---

[10]We decline the invitation of San Mateo and Alameda to rely on the legislative history of Revenue and Taxation Code section 52 to find that, contrary to its plain language, section 52 was intended to assert that the valuation limitations of article XIII, section 11 are the *only* valuation limitations that apply to extraterritorial lands. To use legislative history to construe section 52 contrary to its plain language and then to use that construction of section 52 as the basis for construing article XIII A contrary to its plain language simply forms too tenuous a chain of inferences on which to ground constitutional interpretation.

market value as of a given date, to argue that only property valued at fair market value is subject to the valuation limitation of article XIII A. In doing so, however, they ignore the rest of section 110.1 and the statutory scheme of which it forms a part. To understand this scheme, it is necessary to look first to Revenue and Taxation Code section 51, a statute designed to implement article XIII A.

Revenue and Taxation Code section 51 defines what it refers to as the "taxable value of real property" under article XIII A, that is, the ultimate article XIII A property valuation to which the 1 percent tax rate limitation of article XIII A is applied. Section 51 defines "taxable value" as the lesser of either the "base year value" of the property compounded annually by an inflation factor of no more than 2 percent or the *current* fair market value of the property (in cases where the property has declined in value).

In turn, Revenue and Taxation Code section 110.1 defines the term "base year value" used by Revenue and Taxation Code section 51 to calculate "taxable value." Section 110.1 provides several alternative definitions of "base year value." The definition of full cash value as fair market value in subdivision (a) of section 110.1 that San Mateo and Alameda rely on is the basis for one of these definitions of "base year value." Subdivision (b) of section 110.1 defines "base year value" as the value determined under subdivision (a).

But subdivision (b) is not the only definition of "base year value" to be found in Revenue and Taxation Code section 110.1. Subdivision (d) of section 110.1 provides: "If the value of any real property as shown on the 1975-76 roll was determined pursuant to a periodic appraisal under Section 405.5, that value shall be the 1975 lien date base year value of the property." Periodic appraisals under Revenue and Taxation Code section 405.5 include appraisals made on a "restricted value" basis (Rev. & Tax. Code, § 405.5), such as the appraisal of extraterritorial land under the valuation limitations of section 11.[11] Thus, for extraterritorial land owned at the time of the 1975 assessment, the section 110.1 "base year value" is not its fair market value but its 1975 section 11 valuation. Because section 110.1 defines "base year value" to include valuations of extraterritorial lands made under section 11, that section undermines, rather than supports, the argument of San Mateo and Alameda that article XIII A does not apply to extraterritorial lands.

---

[11]Although Revenue and Taxation Code section 405.5 now excludes property subject to article XIII A from the requirement of periodic appraisals, this exclusion was not added until 1980. Section 110.1, subdivision (d) concerns property whose value on the 1975-1976 tax roll was determined by a periodic appraisal. At the time of the 1975-1976 tax roll, the value of extraterritorial land was determined by a periodic appraisal of its restricted value under section 11.

CONCLUSION

The real property valuation limitations of article XIII A apply to the lands owned by San Francisco in Alameda and San Mateo Counties. Article XIII A's limitation on the valuation of real property is not restricted to real property whose method of valuation before article XIII A took effect was based on fair market value. Article XIII A thus does not exclude from its valuation limitation taxable land owned by a local government and located outside its boundaries. Nor does the application of article XIII A's valuation limitation to extraterritorial lands located outside Mono and Inyo Counties conflict irreconcilably with section 11 of article XIII. Accordingly, for lands that have been owned by San Francisco since before the 1975 assessment, article XIII A limits San Mateo and Alameda to valuing such lands at no more than their 1975-1976 section 11 valuation increased by a maximum of 2 percent per year.

The judgment of the Court of Appeal is reversed with directions to remand the case to the trial court for further proceedings consistent with this opinion.

Lucas, C. J., Arabian, J., Baxter, J., George, J., and Werdegar, J., concurred.

**MOSK, J.,** Concurring.—I agree with the majority's conclusion in part III that article XIII A of the California Constitution applies to property owned by a local government outside its boundaries. Having so concluded, I would not contort our interpretation of article XIII, section 11 (hereafter section 11), in an attempt to reconcile it with article XIII A. I would instead recognize frankly that article XIII A has effected at least a partial repeal of section 11.

The majority state: "On their faces, article XIII A and section 11 do not present any irreconcilable conflict. Section 11 only sets an upper limit on the valuation for tax purposes of property owned by local governments. . . . Article XIII A, too, only sets an upper limit on the valuation . . . of real property . . . ." (Maj. opn., *ante*, at p. 567.) Yet section 11 undoubtedly does more than set an upper limit on the valuation for tax purposes of extraterritorial local government property. It also *authorizes* the taxing jurisdiction to tax that property up to that upper limit. As such, section 11 directly conflicts with article XIII A.

Section 11, the predecessor of which was approved by the voters in 1968, limits the maximum assessment of extraterritorial property outside of Mono and Inyo Counties by an amount that "does not exceed" the lower of (1) its

fair market value times the prevailing percentage of fair market value at which other lands are assessed or (2) a figure derived by multiplying the property's 1967 assessed value by the so-called "Phillips factor." The Phillips factor is intended to reflect the statewide inflation in the assessed value of land, and, according to testimony at trial, averaged an annual 8.37 percent from 1975 to 1988. The majority take the position that the ceiling on the assessment of such property set forth in section 11 is nothing more than a ceiling, and that a constitutional amendment which provides for a lower assessment ceiling is consistent with section 11.

I disagree. The only plausible reading of section 11 is that it mandates a cap on local government taxation of extraterritorial property and grants local governments the authority to tax up to that cap. The phrase "does not exceed" refers to the local government's capacity to value property at a lower rate than that provided by the two formulae, not the capacity of the Legislature, or of the people acting legislatively, to *mandate* a lower rate.

Any ambiguity on this point is resolved by examination of the ballot arguments to the predecessor of section 11. (See *Voters for Responsible Retirement* v. *Board of Supervisors* (1994) 8 Cal.4th 765, 772 [35 Cal.Rptr.2d 814, 884 P.2d 645] [courts may consult ballot arguments of constitutional amendments for indicia of voter intent].) The purpose of this predecessor provision was to establish "a state-wide formula so [the] assessed valuation [of extraterritorial property] will increase at a similar rate to the general increase in property values throughout the State—an estimated 5 per cent each year. [¶] This measure will *assure continuance of an adequate tax base* related to these lands. It will also assure public agencies owning the property that their citizens will not bear more than an equitable share of taxes levied in the taxing counties." (See Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to the voters, Gen. Elec. (Nov. 5, 1968) [hereafter Ballot Pamphlet], argument of Sen. Moscone in favor of Prop. 2, p. 7, italics added.)

As the language of the ballot argument suggests, section 11 represents an effort to reconcile the competing needs of taxed and taxing local jurisdictions. But how can section 11 "assure continuance of an adequate tax base" (Ballot Pamp., *supra*, argument of Sen. Moscone in favor of Prop. 2, p. 7) for the government entities levying taxes if it was not meant as a floor as well as a ceiling, precluding subsequent state legislation that would dictate either a higher *or a lower* valuation of extraterritorial property?

Article XIII A, passed as Proposition 13 in 1978, adopts a different method of valuing real property. Section 2 of that article establishes a base

year of 1975-1976, and provides for a 2 percent maximum increase per year, until the property is sold and a new base year is established. The 2 percent inflation allowance is considerably less than the inflation allowance permitted by the Phillips factor under section 11, which is tied to the statewide average per capita assessed value of land. To state the obvious, section 11 and article XIII A set forth alternative, conflicting, methods of assessing the value of real property. There is little doubt that if article XIII A had been passed as a statute rather than a constitutional amendment, it would have been construed as being more restrictive of local government taxing power than section 11, and therefore inapplicable to the assessment of property governed by section 11. The fact that article XIII A is in constitutional rather than statutory form does not alter the fact that the two provisions are in conflict, and that courts must choose between them to determine the proper method of assessing extraterritorial property.

The choice of which constitutional amendment prevails becomes clear once the purpose of section 11 is recalled. That purpose, as alluded to above, was to ensure "[e]quity in taxation" by tying the valuation of extraterritorial local government property, which is often difficult to assess, to the valuation of private property. (Ballot Pamp., *supra*, argument of Sen. Moscone in favor of Prop. 2, at p. 7.) Section 11 represents a constitutional compromise based on the then-existent property tax scheme; it was, in effect, a form of tax relief for local government entities that owned extraterritorial property. (See Ballot Pamp., *supra*, argument of Sen. Dolwig and Assem. Ryan against Prop. 2, p. 8.) But article XIII A, passed a few years later, provided much more comprehensive, and extensive, property tax relief. If article XIII A, which purports to encompass virtually all real property, did not repeal section 11, then the employment of the latter's valuation method would result in a substantially faster rate of tax increase for local government property than for similarly situated private property—precisely the disparity that section 11 was originally designed to correct. Thus, an examination of the evident aim of section 11 itself leads to the conclusion that its own property tax reform provisions were rendered obsolete by the passage of the more sweeping property tax reform found in article XIII A.

The implied repeal of a constitutional provision is disfavored. (*Board of Supervisors* v. *Lonergan* (1980) 27 Cal.3d 855, 868 [167 Cal.Rptr. 820, 616 P.2d 802].) We have held that article XIII A did not represent a comprehensive revision of state taxation, and therefore did not, as a rule, impliedly repeal the special property tax provisions found in article XIII that predated its passage. (27 Cal.3d at pp. 868-869; see also *ITT World Communications, Inc.* v. *City and County of San Francisco* (1985) 37 Cal.3d 859 [210 Cal.Rptr.

226, 693 P.2d 811].) Yet it is also a fundamental maxim of constitutional law that a provision or provisions should not be interpreted so as to produce an unreasonable result. (See *Pollack* v. *Hamm* (1970) 3 Cal.3d 264, 273 [90 Cal.Rptr. 181, 475 P.2d 213].) If there ever was an exception to the rule against implied repeal it is in this unusual situation in which, because of the changed circumstance of a new constitutional amendment, the purpose behind the provision being repealed would actually be thwarted if that provision were allowed to stand.

Because I find that article XIII A impliedly repealed section 11, at least that portion of section 11 pertaining to land outside of Mono and Inyo Counties, I concur in the holding of the majority that article XIII A governs the valuation of extraterritorial local government property in Alameda and San Mateo Counties, and therefore concur in the majority's judgment.