EDMUND G. BROWN JR. Attorney General MARC J. NOLAN Deputy Attorney General
THE HONORABLE ROBERT A. RYAN, JR., COUNTY COUNSEL FOR THE COUNTY OF SACRAMENTO, has requested an opinion on the following questions:
1. Under the Education Code statute providing that a newly-merged school district "is liable for all of the outstanding bonded indebtedness" previously incurred by its constituent former school districts and related statutory provisions, are the taxing authorities directed to reallocate and reapportion the burden of paying the former districts' cumulative outstanding bonded indebtedness by levying a tax supporting payment of that indebtedness upon all the taxable property within the boundaries of the merged district?
2. If so, does such a statutory directive violate the voter approval provisions of article XIII A of the California Constitution? *Page 2 
 CONCLUSIONS
1. Under the Education Code statute providing that a newly-merged school district "is liable for all of the outstanding bonded indebtedness" previously incurred by its constituent former school districts and related statutory provisions, the taxing authorities are directed to reallocate and reapportion the burden of paying the former districts' cumulative outstanding bonded indebtedness by levying a tax supporting payment of that indebtedness upon all the taxable property within the boundaries of the merged district.
2. The foregoing statutory directive does not violate the voter approval provisions of article XIII A of the California Constitution.
 ANALYSIS
Under the local school district reorganization statutes in the Education Code, [1] residents of four school districts recently voted to merge into one unified school district. At the time of the merger, three of the four former school districts had outstanding general obligation bonded indebtedness. This indebtedness resulted from voters in those three districts having previously approved (i.e., in earlier elections) the issuance of general obligation bonds for the acquisition or improvement of real property, or for the construction, reconstruction, rehabilitation, or replacement of school facilities.[2]
As we recently observed, general obligation bonds are the most common means by which California school districts finance school construction; they serve much the same function as home loans obtained by homeowners to finance the purchase, construction, or improvement of their homes.[3]
Typically, proceeds from the bond sale are used to acquire real property or to finance construction projects. The issuing district then pays the principal and interest on the bonds over time "by an annual levy of an advalorem tax on *Page 3 
real (and certain personal) property located within the area of the district."[4]
In this instance, where districts that have outstanding bonded indebtedness are combined with a district that has no such indebtedness to form a single unified district, there has been uncertainty over which property taxpayers are responsible for paying the outstanding bond obligations. Some argue that all property taxpayers within the boundaries of the unified district are liable for their proportionate share of the bond payments, while others argue that only the property taxpayers within the boundaries of each former school district that issued bonds before the merger are liable for payment of those particular outstanding bond obligations. For the reasons that follow, we conclude that, upon the merger of the districts, all property taxpayers within the unified district's boundaries become liable for paying their proportionate share of all the former districts' debt obligations, and that county taxing authorities must reallocate and reapportion that payment by levying a tax on all taxable property within the boundaries of the unified district.
1. Consolidation of Bonded Indebtedness under the Education Code
We begin our analysis with a review of the relevant statutory framework. Issues pertaining to the bonded indebtedness of merged school districts are treated in sections 35570 through 35579 of the Education Code, [5] which constitute an article (article 8) within a chapter that addresses school district reorganizations.
First, section 35570 delineates the scope of article 8's coverage:
 This article applies only to the reallocation of bonded indebtedness of a school district on general obligation bonds under one of the following conditions:
 (a) The bonded indebtedness was approved by the voters prior to July 1, 1978.
 (b) The bonded indebtedness was incurred for the acquisition or *Page 4 
improvement of real property and was approved on or after July 1, 1978, by two-thirds of the votes cast by the voters voting on the proposition.
 (c) The bonded indebtedness was incurred for the acquisition or improvement of real property and was approved on or after July 1, 1978, by 55 percent of the votes cast by the voters voting on the proposition at a regularly scheduled election or a statewide special election.[6]
Next, section 35571 provides that, "When a school district is created, annexed, or abolished, or the boundaries thereof changed, the liability to taxation for the outstanding bonded indebtedness of the district or the territory affected thereby is as provided in this article." Section 35571 further states that, "The authorities whose duty it is to levy taxes for the payment of principal and interest on the outstanding bondsshall levy the taxes upon the districts affected in such proportions as are provided in, or are determined under, the authority of this article."[7]
Finally, section 35573 states that, "When any school district is in any manner merged with one or more school districts so as to form a single district by any procedure, the district so formed is liable for all of the outstanding bonded indebtedness of the districts united or merged."[8] Under section 35573, then, a merged district "is liable for all of the outstanding bonded indebtedness" of its constituent former districts. Does this mean that all the property taxpayers in the merged district are now liable for paying their proportionate share of all the cumulative outstanding indebtedness, or does that obligation fall only on the property taxpayers residing within the boundaries of those former districts that issued the bonds?
Where we are called upon to interpret the meaning of a statute, our primary task is to ascertain the Legislature's intent.[9] In doing so, we "look first to the words of the statute themselves, giving to the language its usual, ordinary import and according significance, if possible, to every word, phrase and sentence."[10] We do not interpret a *Page 5 
particular phrase or provision in isolation; rather, we "interpret a statute in context, examining legislation on the same subject, to determine the Legislature's probable intent."[11] Where necessary or helpful, we may also resort to extrinsic evidence of legislative intent, including "the ostensible objects to be achieved and the legislative history."[12]
Under the relevant statutes in article 8, when multiple school districts merge, the resulting district is liable for all of the qualified bonded indebtedness of the formerly separate districts.[13]
In such cases, we believe, the taxing authorities are required to levy a tax to support the payment of the cumulative bond debt on all the taxable property within the boundaries of the merged district "in such proportions as are provided in, or are determined under, the authority of this article."[14] If only those properties that were within the boundaries of a former issuing district could be taxed to pay the former district's old bond debt, then the apparent reallocation of debt and supporting tax levy that article 8 calls for would be hollow and nugatory. We decline to interpret statutes in a way that nullifies their intended effect.[15]
Such a reading would also be inconsistent with further directives contained in article 8, whose plain language evidences a legislative intent that districts' assets and liabilities be reapportioned upon their reorganization in a variety of ways.[16]
Our interpretation finds further support in the legislative history of article 8. When it was enacted in 1980, article 8 was designed simply to reorganize then-existing law, which since 1970 had provided for a similar "bond leveling" procedure for school *Page 6 
district reorganizations.[17] Nonetheless, there was significant concern at the time whether this procedure would be valid in light of State Constitution article XIII A, which had only recently been adopted by the voters as Proposition 13.[18] Specifically, there was concern that the procedure might violate article XIII A because it would result in the reallocation of payment obligations to some property taxpayers who had not had the opportunity to vote on the relevant bond measures.[19]
Although these concerns were subsequently addressed in, and assuaged by, an opinion from the Legislative Counsel, [20] their very existence confirms that the Legislature's intent in article 8 was (1) to transfer the bond liabilities of separate districts to a new, merged district, and (2) to require taxing authorities to levy taxes upon all taxable property within the territory of the merged district, irrespective of whether all voters affected by the reallocation had had an opportunity to vote on the initial issuance of the bonds. *Page 7 
Thus, in response to the first question, we conclude that, under the applicable provisions of article 8, taxing authorities are directed to reallocate and reapportion the burden of paying the former districts' cumulative outstanding bonded indebtedness by levying a tax upon all the properties within the boundaries of the merged district.
2. Proposition 13
Our analysis does not end with our consideration of the Education Code, however, because the reallocation of debt without voter approval raises the possibility of a constitutional issue. Some have argued that section 35573 and its related provisions violate article XIII A of the state constitution because they impose a tax to satisfy bonded debt on taxpayers who did not have an opportunity to vote on whether such bonds should be issued in the first instance. For the reasons that follow, we reject that argument.
We take it as well established that "[t]he legislative power over school districts is plenary and upon the reorganization or unification of districts the Legislature may make provision for the division of property and apportionment of the debts of the old district."[21] Further, this legislative enactment (like all others) "is presumptively constitutional and all doubts are to be resolved in favor of its validity."[22]
Therefore, a law must be sustained against constitutional challenge whenever it is susceptible of a reasonable interpretation consistent with the constitution.[23] Moreover, as the Supreme Court has observed, "the presumption of constitutionality accorded to legislative acts is particularly appropriate when the Legislature has enacted a statute with the relevant constitutional prescriptions clearly in mind."[24] After reviewing the relevant legislative history, we are persuaded that the provisions of article 8 have been crafted to conform to constitutional provisions requirements.
On June 6, 1978, the voters passed Proposition 13, which added article XIII A to the constitution.[25] "Article XIII A's purpose was to restrict the taxation of real property generally by limiting the growth in valuation of real property and by limiting the *Page 8 
maximum tax rate imposed on real property."[26] Article XIII A took effect on July 1, 1978, and has been amended twice, in 1986 and 2000, by subsequent voter initiatives. In relevant part, section 1 of article XIII A provides:
 (a) The maximum amount of any ad valorem tax on real property shall not exceed One percent (1%) of the full cash value of such property. The one percent (1%) tax to be collected by the counties and apportioned according to law to the districts within the counties.
 (b) The limitation provided for in subdivision (a) shall not apply to ad valorem taxes or special assessments to pay the interest and redemption charges on any of the following:
 (1) Indebtedness approved by the voters prior to July 1, 1978.
 (2) Bonded indebtedness for the acquisition or improvement of real property approved on or after July 1, 1978, by two-thirds of the votes cast by the voters voting on the proposition.
 (3) Bonded indebtedness incurred by a school district, community college district, or county office of education for the construction, reconstruction, rehabilitation, or replacement of school facilities, including the furnishing and equipping of school facilities, or the acquisition or lease of real property for school facilities, approved by 55 percent of the voters of the district or county, as appropriate, voting on the proposition on or after the effective date of the measure adding this paragraph. . . . .
Thus section 1(a) imposes a general 1% limit on real property taxes, while section 1(b) provides the exception to that general limit — that is, the 1% limit "shall not apply" to the three types of indebtedness specified in section 1(b). As mentioned earlier, section 35570 identifies these same three types of indebtedness as the only ones eligible for reallocation when school districts merge. The legislative history of section 35570 shows that its parallel to the language of section 1(b) was intentional.
When it was originally adopted in 1978, article XIII A contained only one exception, and that was for the payment of "any indebtedness approved by the voters prior to [July 1, 1978]."[27] Soon after, in 1980, article 8 was added to the Education Code *Page 9 
as part of Assembly Bill 3018.[28] As enacted, section 35570 stated: "The provisions of this article shall apply only to the reallocation of bonded indebtedness incurred prior to July 1, 1978."[29]
In 1986, the voters passed Proposition 46, which amended article XIII A to add a second exception, for the repayment of "any bonded indebtedness for the acquisition or improvement of real property approved on or after July 1, 1978, by two-thirds of the votes cast by the voters voting on the proposition."[30] Thereafter, the Legislature amended section 35570 to incorporate this second type of bonded indebtedness into article 8.[31]
Most recently, in 2000, the voters passed the School Facilities Local Vote Act (Proposition 39), which amended article XIII A into its current form by adding a third exception to the 1% limit, this time for the payment of any "bonded indebtedness incurred by a school district, community college district, or county office of education for the construction, reconstruction, rehabilitation, or replacement of school facilities, . . . approved by 55 percent of the voters of the district or county, as appropriate, voting on the proposition. . . ." The primary impact of this measure was to reduce the threshold required to pass certain local school district bond issues from a two-thirds vote to a 55% vote.[32] Once again, the Legislature amended section 35570 to conform to article XIII A, [33] i.e., by making the provisions of article 8 applicable to this third type of bonded *Page 10 
indebtedness.[34] Thus it is apparent that the Legislature had article XIII A's general limitation on real property taxation — and its specific exceptions — "clearly in mind"[35] when it established and modified the scope of article 8. This gives us a measure of confidence in approaching its construction with the presumption that it is constitutionally valid.[36]
With that in mind, we turn to the question whether section 35573's bond-leveling directive is susceptible of any reasonable interpretation consistent with article XIII A's voter approval requirements.[37] On that point, we find it significant that the Legislature was concerned about this very issue when it considered enacting article 8 in 1980. For example, an Assembly Education Committee Report dated April 7, 1980 stated that the bill would:
 reorganize[] current law which provides for division or assumption of outstanding bond obligations by electors who never voted on the obligation. While this is current law, it is in clear violation of subdivision (b) of Section 1 of Article XIII A of the Constitution. [¶]. . . . Current law makes provisions for "leveling of bonds" by either dividing the obligation among districts into which a reorganized district is split or having a consolidation of districts assume the total obligations of the component districts (there are other minor variations). Under the provisions of Proposition 13, a new ad valorem tax cannot be levied for debt service if the electorate did not vote for it.[38]
To address this concern, the Legislature sought Legislative Counsel's view as to whether the debt reallocation procedure contemplated in the pending legislation would continue to pass constitutional muster in a post-Prop 13 environment since, under this procedure, property taxpayers who had not approved the bonds in the first instance would become liable for a proportionate share of their payment. *Page 11 
Legislative Counsel concluded that the procedure was constitutional, stating:
 The exception to the property tax limitation provided by subdivision (b) of Section 1 of Article XIII A of the California Constitution applies to the entire territory of the reorganized district, including that portion of the territory of the reorganized district the voters of which did not initially vote to authorize the indebtedness incurred [] by the issuance of local school bonds. . . . .[39]
In its reasoning, the Legislative Counsel's opinion relied on the 1977 Court of Appeal decision in Metropolitan Water District v. Dorff.[40]
In Dorff, a water district annexed some new territory, and then took the position that the properties in the newly-annexed territory were subject to property taxes to pay their share of the district's pre-annexation indebtedness, which had been approved by the district's voters before Proposition 13 took effect. The district settled on a resolution to that effect, but its executive secretary refused to issue the resolution as directed, asserting that, under Proposition 13, the properties in the newly-acquired territory could not be subjected to increased taxation for purposes of paying bonds that they had not had the opportunity to vote on and approve.
The Court of Appeal agreed with the water district. Because it is central both to Legislative Counsel's 1980 reasoning and to ours, we quote the court's rationale at length:
 On this appeal we are required to construe section 1 of Article XIII A, which provides: "(a) The maximum amount of any ad valorem tax on real property shall not exceed one percent (1%) of the full cash value of such property. The one percent (1%) tax to be collected by the counties and apportioned according to law to the districts within the counties. [¶] (b) The limitation provided for in subdivision (a) shall not apply to ad valorem taxes or special assessments to pay the interest and redemption charges on any indebtedness approved by the voters prior to the time this section becomes effective [July 1, 1978]." The precise question presented is whether, under this provision, the real property which will be annexed to Metropolitan after July 1, 1978, is subject to an ad valorem tax in excess of 1 percent to pay interest and redemption charges on indebtedness of *Page 12 
Metropolitan approved by the voters prior to that date. Appellant contends that the property to be annexed is not subject to such taxation because it was not included within the territory served by Metropolitan at the time the indebtedness was approved.
 As a general rule, in the absence of statute or constitutional provisions to the contrary, territory annexed to a municipal corporation or district is liable to pay its proportionate share of the existing indebtedness of the corporation or district to which it is annexed. [Citations.] The reason for this rule is expressed as follows in Linke v. Board of County Com'rs of Grand County:[41] "It is common justice that the owners of property in the annexed territory should share their proportionate part of the burden legally assumed before their property was annexed, since they reap the benefits thereof." The rule is reflected in Metropolitan Water District Act section 374, which provides in pertinent part: "If such territory has not previously been annexed to, or consolidated with, such member public agency, upon completion of such annexation to, or consolidation with, such agency in compliance with the applicable provisions of law, including this article, such territory shall become a part of the district, and the taxable property in such territory shall be subject to taxation for the purposes of such district, including the payment of any authorized or outstanding bonds or other obligations of such district." (Italics added.) Appellant argues that section 374 conflicts with the express provisions of section 1 of Article XIII A and therefore is repealed by implication.
 The implied repeal of a statute by a later constitutional provision is not favored; in fact the presumption is against such repeal, especially where the prior statute has been generally understood and acted upon. [Citations.] "To overcome the presumption the two acts must be irreconcilable, clearly repugnant, and so inconsistent that the two cannot have concurrent operation. The courts are bound, if possible, to maintain the integrity of both (the statute and the constitutional provision) if the two may stand together." [Citations.] Article XIII A, section one, of the California Constitution and section 374 of the Metropolitan Water District Act are not inconsistent and irreconcilable so as to prevent their concurrent operation. The constitutional provision, after declaring that the maximum ad valorem tax on real property shall not exceed one percent of its full cash value [citation], goes on to state: "The limitation provided for in subdivision (a) shall not apply to ad valorem taxes or special assessments to pay the *Page 13 
interest and redemption charges on any indebtedness approved by the voters prior to the time this section becomes effective." [Citation.] In creating an exception to the 1 percent tax limitation, section 1(b) specifies only the indebtedness to which the exception is applicable; it is silent regarding the property included within the exception. At this point, section 374 steps in and provides that taxable property annexed to Metropolitan is subject to taxation for payment of authorized or outstanding obligations of Metropolitan. Thus, section 374 complements article XIII A, section 1, and effect may be given to both.
 Relying on the principle that arguments presented to the electorate in support of a proposed constitutional provision may be consulted in determining the purpose of the provision [citations], appellant contends that the arguments in favor of the adoption of article XIII A show that the purpose of such constitutional provision is to avoid the burden of excessive taxation of real property. Be that as it may, such arguments cannot supply language which does not appear in section 1(b) of article XIII A. That provision creates an exception to the one percent ad valorem property tax limitation for the payment of indebtedness approved by the voters before July 1, 1978, but does not state that the exception applies only to real property which was subject to taxation for the payment of such indebtedness prior to that date. "`Courts are no more at liberty to add provisions to what is declared (in the Constitution) in definite language, than they are to disregard existing express provisions (of the Constitution). [Citations.]'"
 Section 374 of the Metropolitan Water District Act was enacted in 1969. [Citation.] Pursuant to that statute, which embodies a well established common law principle, taxable property newly annexed to Metropolitan has been consistently subject to taxation for the payment of any authorized or outstanding bonds or other obligations of the district. In the absence of a more clear-cut mandate than the language of section 1, subdivision (b) of article XIII A, we may not presume that such provision abrogated the principle expressed in section 374. [Citations.]
 We conclude that section 1 of article XIII A of the California Constitution does not prohibit the levy of an ad valorem tax in excess of 1 percent on property annexed to Metropolitan after July 1, 1978, for the payment of indebtedness of Metropolitan approved by the voters prior to *Page 14 
that date.[42]
For its part, Legislative Counsel concluded that the debt reallocation procedures for reorganized school districts were analogous to the Water District Act section at issue in Dorff.[43] Noting that the then-applicable reallocation procedures for reorganized school districts "generally makes the reorganized district liable for the outstanding bond debt of acquired territory,"[44] Legislative Counsel reasoned that, "under statutory provisions in existence at the time of the addition of Article XIII A to the California Constitution, . . . all taxable property within a reorganized school district would be subject to taxation for the outstanding bond obligations . . . which had been previously incurred by the voters of territory within the reorganized district."[45]
Acknowledging that Dorff "involved a different body of statutory law than is applicable to school districts," Legislative Counsel nevertheless found no reason not to apply Dorff's reasoning to school district reorganizations as well.[46]
Here, too, we believe that the central holding of Dorff, which has not been questioned in the reported decisions in the more than thirty years since it was issued, [47] controls the issue. Article XIII A, section 1(b), specifies three types of indebtedness that are excluded from the 1% limitation, but, as was the case in Dorff, it remains silent as to *Page 15 
the real property to which the exception applies.[48] In the context of school district mergers, section 35573 provides the answer: it applies to all of the real properties within the boundaries of a lawfully merged district, such as the unified district in the present case. Section 35573 thus complements article XIII A and "effect may be given to both."[49]
We realize that not all taxpayers may be aware of the debt reallocation procedures set forth in the Education Code. Therefore, not all of them will intuitively understand that some taxpayers may see an increase in their tax bills as a result of a school district merger, while others see a decrease, even though the aggregate liability of a merged district stays the same as it was before the merger.[50] Nevertheless, the general principle of debt reallocation was firmly established before article XIII A was adopted, and reflects a longstanding equitable principle that "when the benefits are taken the burdens are assumed."[51]
If the drafters and proponents of Proposition 13 had believed that such principles and procedures needed to be altered or repealed, they could have inserted a "clear-cut mandate" to that effect into the text of the proposed constitutional *Page 16 
amendment.[52] As it is, however, the text of the constitutional provision may be harmonized with preexisting and otherwise lawful debt reallocation procedures. Under the circumstances, the Court of Appeal inDorff declined to imply their repeal in the wake of Proposition 13, and we decline to reach a contrary conclusion.[53]
Therefore we conclude that the bonded debt reallocation and tax levy requirements of Education Code section 35573 and related statutory provisions do not violate the voter-approval provisions of article XIII A of the California Constitution.
[1] See Educ. Code §§ 35500-35579, 35700-35787.
[2] The state Constitution requires voter approval for the issuance of school district bonds. Traditionally, a proposal to issue school construction bonds had required approval by two-thirds of the district's voters. Cal. Const. art. XIII A, § 1(b)(2); art. XVI, § 18(a). Under a 2000 amendment, however, approval by 55 percent of the voters suffices if specified conditions are met. Cal. Const. art. XIII A, § 1(b)(3); art. XVI, § 18(b); see Comm. for Responsible Sch. Expansion v. Hermosa BeachCity Sch. Dist., 142 Cal. App. 4th 1178, 1184-1185 (2006);87 Ops.Cal.Atty.Gen. 157, 157-159 (2004).
[3] See 92 Ops.Cal.Atty.Gen. 1, 2 (2009). The discussion in this opinion relates only to general obligation bonded indebtedness.
[4] San Lorenzo Valley Community Advoc. for Responsible Educ. v. SanLorenzo Valley Unified Sch. Dist., 139 Cal. App. 4th 1356, 1395
(2006); see also Cal. Debt Inv. Advisory Comm'n., Cal. Debt IssuancePrimer, ch. 6 "Types of Financing Obligations — Local Agency General Obligation Bonds" at 134-135 (2005), available online athttp://www.treasurer.ca.gov/cdiac/debtpubs/primer.pdf.
[5] All further references to the Education Code are by section number only.
[6] Emphasis added. For purposes of our analysis, we assume that each of the former districts' outstanding bonds was lawfully issued with the requisite voter approval.
[7] Emphasis added.
[8] Emphasis added.
[9] Freedom Newsps., Inc. v. Orange Co. Employees' Ret. Sys.,6 Cal. 4th 821, 826 (1993).
[10] Dyna-Med, Inc. v. Fair Empl. Hous. Com., 43 Cal. 3d 1379,1386-1387 (1987).
[11] Cal. Teachers' Assoc. v. Gov. Bd. of Rialto Unif. Sch. Dist.,14 Cal. 4th 627, 642 (1997).
[12] Day v. City of Fontana, 25 Cal. 4th 268, 272 (2001).
[13] See §§ 35570 (qualified indebtedness), 35573 (liability for merged districts for indebtedness).
[14] See § 35571 (taxing authorities "shall levy the taxes" in specified proportions).
[15] See People v. Carter, 48 Cal. App. 4th 1536, 1540 (1996); Kanev. Super. Ct., 37 Cal. App. 4th 1577, 1587 (1995).
[16] E.g., §§ 33575-33576 (annexed territory relieved of liability for outstanding bonded indebtedness in the district of which it was formerly a part and "shall automatically assume its proportionate share of the outstanding bonded indebtedness of the district of which it becomes a part"); § 33578 (proceeds of bonds that were authorized, but not sold, by former district become funds of new district).
[17] See former §§ 4140-4152 (West 1977); 1976 Cal. Stat. ch. 1010 § 2; §§ 1901 1908 (West 1971); 1970 Cal. Stat. ch. 1549, § 9. Before 1970, a former district or territory that was made part of a new merged school district was not liable for its proportionate share of the outstanding, collective bonded indebtedness of the new district unless a two-thirds majority of the voters in the affected area voted to assume that liability in an election held for that purpose. See former §§ 1822, 1822.1, 1822.3 (West 1969). Under this earlier procedure, however, a vote to assume bond liability had no real financial consequence to area taxpayers. This is so because, if an area did not vote to assume its share of the new district's bonded indebtedness, it would still be required to pay an "annual charge," to be collected as a tax on real property "equal to the annual amount required for the interest and redemption of the outstanding bonds," and to "continue for the entire period during which any bonded indebtedness is outstanding against any included district." Former § 1822.2 (West 1969); see also former § 1825 (West 1969) (providing for "use charge" to cover bond debt in cases of divided former districts); see also Co. of Shasta v. Co. of Trinity,106 Cal. App. 3d 30, 36-37 (1980) (interpreting former Education Code sections). In contrast, section 33573's predecessor statute made "newly formed, united, or merged districts [] liable for outstanding bonded indebtedness of the districts or portions of the districts included in the new district." Sen. Educ. Comm. Analysis of Sen. 163 (Apr. 1970) at 1-2; see also Assembly Educ. Comm. Analysis of Sen. 163 (Jun. 11, 1970) at 1. A legislative analysis noted that the proposed procedure "would greatly simplify the bond leveling procedure," but also observed that "some electors would be saddled with bond liability for which they had no vote." Assembly Educ. Comm. Analysis of Sen. 163 (Jun. 11, 1970) at 2.
[18] See Assembly Educ. Comm. Analysis of Assembly 3018 (Apr. 7, 1980) at 1-2.
[19] Id.
[20] Op. Leg. Counsel No. 10044, addressed to Assemblyman Robert W. Naylor regarding Assembly 3018 (Jun. 20, 1980) at 2, 6.
[21] Co. of Shasta v. Co. of Trinity, 106 Cal. App. 3d at 36; PassSch. Dist. v. Hollywood Sch. Dist., 156 Cal. 416, 418-419 (1909).
[22] Kizziah v. Dept. of Transp., 121 Cal. App. 3d 11, 18 (1981).
[23] Id.
[24] Pac. Leg. Found. v. Brown, 29 Cal. 3d 168, 180 (1981).
[25] Metro. Water Dist. of S. Cal. v. Dorff, 98 Cal. App. 3d 109, 113
(1979).
[26] City Co. of San Francisco v. Co. of San Mateo, 10 Cal. 4th 554,569 (1995).
[27] Former Cal. Const. Art XIII A §§ 1(b), 5; see Metro. WaterDist. v. Dorff, 98 Cal. App. 3d at 113.
[28] 1980 Stat. ch. 1192 § 2 (Assembly 3018).
[29] Former § 35570 (West 1981).
[30] Former Cal. Const. art. XIII A, § 1(b)(2).
[31] 1990 Cal. Stat. ch. 208, §§ 1, 2. As then amended, section 35570 provided that article 8 would apply to bonded indebtedness "incurred for the acquisition or improvement of real property and [] approved on or after July 1, 1978, by two-thirds of the votes cast by the voters voting on the proposition." Former § 35570(b) (West 1991).
[32] See Foothill-De Anza Community College Dist. v. Emerich,158 Cal. App. 4th 11, 23 (2007). Proposition 39 made a parallel change to Article XVI, section 18, of the Constitution — also known as the "constitutional debt limit" — which previously had required a two-thirds majority vote before a school district could legally incur a discretionary indebtedness or liability that exceeded "in any year the income and revenue provided for such year."
[33] 2006 Cal. Stat. ch. 730, § 6; see also Bill Analysis Assem. Educ. Comm. (Apr. 5, 2006) at 1; Bill Analysis, Assem. Appropriations Comm. (May 17, 2006) at 1.
[34] The provisions of article 8 now apply to bonded indebtedness incurred "for the acquisition or improvement of real property and [] approved . . . by 55 percent of the votes cast by the voters voting on the proposition at a regularly scheduled election or a statewide special election." § 35570(c).
[35] Pac. Leg. Found. v. Brown, 29 Cal. 3d at 180.
[36] See id.
[37] See Kizziah v. Dept. of Transp., 121 Cal. App. 3d at 18.
[38] See Assembly Educ. Comm. Analysis of Assem. Bill 3018 (Apr. 7, 1980) at 1-2.
[39] Op. Leg. Counsel No. 10044 at 2, 6. Legislative Counsel also applied this conclusion to a similar form of indebtedness, i.e., that incurred by an obligation to repay a state school building aid loan.
[40] 98 Cal. App. 3d at 109.
[41] 129 Colo. 165, 172, 268 P.2d 416, 420 (1954).
[42] Dorff, 98 Cal. App. 3d at 113-115 (emphases added).
[43] As mentioned above, the Legislature enacted section 35573's predecessor statute (former § 1903) in 1970. This enactment changed former law which had provided, on the one hand, that a former school district merged into a larger district would not be liable for any additional bonded indebtedness unless the voters of that former district voted to assume it, but required, on the other hand, that a former district whose voters declined to formally assume such indebtedness would be obligated to pay an annual charge that was equal to the amount it would have been required to repay had the voters of the former district voted to assume the debt.
[44] Op. Leg. Counsel No. 10044 at 4.
[45] Id.
[46] Id. at 7.
[47] Indeed, Dorff has been cited favorably for the proposition that extrinsic materials such as ballot arguments or initiative summaries cannot supply what is missing from the text of a constitutional provision adopted via initiative measure. See Sanford v. Garamendi,233 Cal. App. 3d 1109, 1122-1123 (1989); Pugh v. City of Sacramento,119 Cal. App. 3d 485, 490-491 (1981).
[48] See also 62 Ops.Cal.Atty.Gen. 339, 342-343 (1979) (observing that section (1)(b) "does not state that in order to be exempt from the one percent limitation of section 1, subdivision (a) the indebtedness must be approved by the voters of the particular district subject to the levy; the exception merely provides that the indebtedness must be approved by the voters").
[49] Dorff, 93 Cal. App. 3d at 115.
[50] We have been told that the voter pamphlet distributed in connection with the proposed school district merger that led to this opinion request stated, "`Although the new district will benefit from increased funding for each student from the State, the reorganization will not raise local taxes,'" and it is urged that this statement misinformed the voters of "the ramifications of the creation of the District." Ltr. from Unified Dist. Counsel to Unified Dist. Trustees at 7 (Jan. 12, 2009). Whether this statement misinformed the voters, or what remedies an aggrieved person might pursue, are issues that are beyond the scope of this opinion
[51] Town of Mt. Pleasant v. Beckwith, 100 U.S. 514, 528-529 (1879);see Downey Co. Water Dist., 202 Cal. App. 2d at 804-805; see also 2A McQuillan, Municipal Corporations, ch. 7 "Corporate Boundaries and Subdivisions" § 7.61 ("As a rule, existing debts of the corporation contracted before the limits were extended, unless otherwise provided by law, are chargeable upon the added territory as well as that comprehended by the boundaries before they were altered or extended. [fn.] In other words, the annexed territory may be required to pay the prior obligations of the municipal corporation." (citing, among other sources, Metro. WaterDist. v. Dorff, 98 Cal. App. 3d 109).) See generally Civ. Code § 3521
("He who takes the benefit must bear the burden.").
[52] Dorff, 93 Cal. App. 3d at 115.
[53] Five days before the opinion in Dorff was published, and therefore without the benefit of the Court of Appeal's analysis in that case, we issued a legal opinion that concluded that the Education Code debt reallocation procedure would only be constitutionally permissible if the reorganization and debt reallocation occurred before Proposition 13's effective date. 62 Ops.Cal.Atty.Gen. 533, 544-545 (1979). We now disapprove this aspect of our earlier opinion in light of the holding inDorff, which makes the timing of the annexation/reorganization and resulting debt reallocation irrelevant; rather, the key event in determining whether an Article XIII A, section 1(b), exception applies to a given voter-approved indebtedness is the vote that legally authorized the indebtedness in the first place.
More recently we concluded, consistent with the position we take here, that Local Agency Formation Commission procedures that subject properties in territory annexed to a city or district to taxation for general or special taxes, benefit assessments, fees, or charges that the acquiring city or district had previously authorized did not require further voter approval under the analogous provisions of articles XIII C and XIII D.82 Ops.Cal.Atty.Gen. 180, 187-189 (1999). *Page 1