Filed 1/6/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| COUNTY OF SANTA CLARA,<br><br>    Petitioner,<br><br>    v.<br><br>SUPERIOR COURT OF SANTA CLARA COUNTY,<br><br>    Respondent;<br><br>AT&T MOBILITY LLC et al.,<br><br>    Real Parties in Interest. | H049161<br>(Santa Clara County<br> Super. Ct. Nos.  20CV363802,<br>   20CV363804, 20CV363806) |

Revenue and Taxation Code section 100, subdivision (b) (hereafter, section 100(b)),[1] establishes formulas for calculating the debt-service component of certain property taxes.  Pursuant to that statute, petitioner County of Santa Clara (County) has imposed taxes on the property of plaintiffs and real parties in interest, various privately owned public utility companies (hereafter utilities), at rates higher than those imposed on non-utility property.  Although section 100(b) was enacted in 1986, the utilities now assert that imposition of a higher debt-service tax rate on their property, pursuant to the formulas set forth in the statute, violates article XIII, section 19, of the California Constitution (hereafter, article XIII, section 19).

That section provides that the state-assessed property of certain regulated utility companies "shall be subject to taxation to the same extent and in the same manner as

---

[1] Unspecified statutory references are to the Revenue and Taxation Code.

other property." (Art. XIII, § 19.) The utilities contend this provision mandates application of equal tax rates to utility property and to locally assessed non-utility property. Accordingly, they sought a refund from the County for fiscal years 2014-2015 and 2015-2016. The County denied the refund, and the utilities filed these lawsuits.

The County demurred, arguing that article XIII, section 19, does not mandate equal tax rates. The trial court overruled the demurrers, holding that it could not determine the legislative intent of article XIII, section 19, and the County had not carried its burden of establishing that the utilities cannot state a claim.

This petition for writ of mandate followed.

We now reverse. After considering the question presented and the parties' arguments, we conclude that article XIII, section 19, does not mandate that utility property be taxed at the same rate as other property. Instead, it provides that, after utility property is assessed by the State Board of Equalization, it shall be subject to ad valorem taxation at its full market value by local jurisdictions.

Accordingly, we grant the County's petition for writ of mandate.

## I. FACTUAL AND PROCEDURAL BACKGROUND[2]

This writ petition comes to us from three related superior court actions involving substantively identical pleadings and legal issues for which the trial court issued a single order.

In each action, a group of privately held public utilities sued the County for property tax refunds for fiscal years 2014-2015 and 2015-2016, following the County's

---

[2] We derive our facts from those properly pleaded in the complaint and matters properly judicially noticed. (*Moore v. Conliffe* (1994) 7 Cal.4th 634, 638; *Apple Inc. v. Superior Court* (2017) 18 Cal.App.5th 222, 240 (*Apple*).) We take as true properly pleaded material facts alleged in the pleadings, disregarding contentions, deductions, and conclusions of fact or law. (*Southern California Gas Leak Cases* (2019) 7 Cal.5th 391, 395.)

2

denial of refund claims submitted pursuant to section 5097. The utilities in the three respective actions are: AT&T Mobility LLC, Pacific Bell Telephone Company, AT&T Corp. (AT&T); Sprint Communications Company, L.P., Sprint Telephony PCS, L.P. (Sprint); and T-Mobile West LLC (T-Mobile).

The utilities filed substantively identical operative first amended complaints in September 2020. Each complaint alleges a single cause of action against the County for a "claim for refund of state-assessed property tax under Rev. & Tax. Code § 5140."[3]

Specifically, the complaints allege that the property tax rates calculated and applied by the County pursuant to section 100(b) were "in excess" of the separately calculated rates applied by the County in the same years to other non-utility property. The debt-service component tax rates applied to the utilities' property in the County in 2014-2015 and 2015-2016 were 1.04 percent and 1.092 percent, respectively.[4] By contrast, the debt-service component tax rate applied to other property in the County those years was 0.202 percent.

The complaints further allege that the higher property tax rate for the utilities' property "violates Article XIII, section 19 of the California Constitution," which provides in part that utility property "shall be subject to taxation to the same extent and in the same manner as other property." (Art. XIII, § 19.)

According to the complaints, the California Supreme Court, in *ITT Worldcommunications, Inc. v. City and County of San Francisco* (1985) 37 Cal.3d 859 (*ITT*), interpreted that section of the Constitution as requiring that state-assessed property such as that of the utilities be taxed at the same tax rate as other property.

---

[3] The complaints also named the State Board of Equalization as defendants, but they did not join the County's petition to this court.

[4] As explained further below, the "debt-service" tax rate component is in addition to a maximum 1-percent general levy, and is intended to generate sufficient revenue to pay interest and principal on voter-approved indebtedness.

The complaints pray for judgments awarding refunds in the following amounts: $4,952,002 for 2014-2015 and $5,696,648 for 2015-2016, plus interest, for the AT&T plaintiffs; $689,663 for 2014-2015 and $782,628.76 for 2015-2016, plus interest, for the Sprint plaintiffs; and $499,254 for 2014-2015 and $609,960 for 2015-2016, plus interest, for T-Mobile.

The County demurred to the complaints. It argued the complaints failed to state a claim because article XIII, section 19, "does not require utility property to be taxed at the exact same *ad valorem*[5] tax rate as all other locally assessed property."[6] Instead, it requires that such property be assessed at full value by the State Board of Equalization (SBOE), "as opposed to being undervalued by local assessors; and . . . placed on the local rolls for taxation purposes, as opposed to being subject to a State gross receipts tax."

In support, the County requested judicial notice of the previous version of article XIII, section 19, legislative analysis materials, and legislative history of section 100(b).

In opposition, the utilities argued that article XIII, section 19, prohibits higher tax rates on the utilities' property. They relied chiefly on the California Supreme Court's decision in *ITT*, which they claim held that article XIII, section 19, mandates that public utility property "be levied on at the same rate as locally assessed property." In reply, the County argued that the cited language in *ITT* is dicta.

The trial court overruled the demurrers in April 2021. It noted that it could not divine the legislative intent of the relevant language in article XIII, section 19, from the materials the County submitted. It also explained that, "[a]lthough the Supreme Court in

---

[5] " 'Ad valorem property taxation' means any source of revenue derived from applying a property tax rate to the assessed value of property." (§ 2202; *Heckendorn v. City of San Marino* (1986) 42 Cal.3d 481, 487.)

[6] The County also made various procedural arguments not at issue in this writ petition.

4

*ITT* did not undertake a statutory interpretation of Section 19, it read this second sentence to plainly mean that utility property would be taxed at the same rate as other property." The trial court did not directly address the County's argument that the relevant language in *ITT* is dicta, and instead concluded the County had not met its burden of establishing that the utilities could not state a claim as a matter of law.

The court included in its order, pursuant to a request by the County under Code of Civil Procedure section 166.1, a statement that "the court indicates a belief that there is a controlling question of law as to which there are substantial grounds for difference of opinion, appellate resolution of which may materially advance the conclusion of the litigation."

The County then filed a petition for writ of mandate in this court in June 2021. In February 2022, we issued an order to show cause, stayed the superior court proceedings, and requested briefing from the parties.

## II. DISCUSSION

An order overruling a demurrer is not directly appealable and a writ will " 'rarely [be] granted unless a significant issue of law is raised, or resolution of the issue would result in a final disposition as to the petitioner.' " (*Apple*, *supra*, 18 Cal.App.5th at pp. 238-239, quoting *Casterson v. Superior Court* (2002) 101 Cal.App.4th 177, 182.) Nevertheless, " '[a]lthough appellate courts are loath to exercise their discretion to review rulings at the pleading stage, they will do so where the circumstances are compelling and the issue is of widespread interest.' " (*Apple*, *supra*, at p. 239, quoting *County of Santa Clara v. Superior Court* (2009) 171 Cal.App.4th 119, 126.)

Although the parties disagree as to the resolution, they agree that writ review is warranted.

We agree that writ review is appropriate here to determine whether article XIII, section 19, requires that certain state-assessed property be taxed at the same rate as other property.

5

### A. Standard of review

We review an order overruling a demurrer de novo, including in the context of a petition for writ of mandate. (*City of Stockton v. Superior Court* (2007) 42 Cal.4th 730, 747 [ordinary standards of demurrer review apply].) " ' " 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context." ' " (*Apple*, *supra*, 18 Cal.App.5th at p. 240.)

The issue presented in this case is a question of law involving constitutional interpretation, which we review de novo. (*Rodriguez v. Superior Court of Santa Clara County* (2021) 70 Cal.App.5th 628, 644; *People ex rel. Lockyer v. Sun Pacific Farming Co.* (2000) 77 Cal.App.4th 619, 632.)

### B. Maxims of constitutional and statutory interpretation

The utilities concede that the County had the authority under section 100(b) to levy the taxes they now contend must be refunded. Their suits for refund thus effectively challenge the constitutionality of section 100(b), as applied to them by the County.[7]

We begin with the basic principle that " 'all intendments favor the exercise of the Legislature's plenary authority: "If there is any doubt as to the Legislature's power to act in any given case, the doubt should be resolved in favor of the Legislature's action. Such restrictions and limitations [imposed by the Constitution] are to be construed strictly, and are not to be extended to include matters not covered by the language used." ' " (*California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 253.) Moreover,

---

[7] The utilities contend that their interpretation of article XIII, section 19, would not necessarily render section 100(b) unconstitutional because in some counties the "[s]ection 100 formula for state-assessed property may be consistent with other tax rates." However, that would not alter the fact that section 100(b) authorizes imposition of higher rates on utility property, which is what the utilities challenge here.

"the legislative power the state Constitution vests is plenary.  Under it, 'the entire law-making authority of the state, except the people's right of initiative and referendum, is vested in the Legislature, and that body may exercise any and all legislative powers which are not expressly or by necessary implication denied to it by the Constitution.' " (*Id.* at p. 254.)  We must, therefore, determine whether article XIII, section 19, denies the Legislature the authority to enact the formula set out in section 100(b).

In interpreting the constitutional provision, the voters' intent governs.  (*Delaney v. Superior Court* (1990) 50 Cal.3d 785, 798 (*Delaney*).)  To determine intent, we first turn " 'to the words themselves for the answer.' " (*Ibid.*, quoting *Brown v. Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 724.)  " 'If the language is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature (in the case of a statute) or of the voters (in the case of a provision adopted by the voters).' " (*Delaney*, *supra*, at p. 798, quoting *Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735.)

However, the " 'plain meaning' rule does not prohibit a court from determining whether the literal meaning of a [constitutional provision] comports with its purpose . . . ." (*Lungren v. Deukmejian*, *supra*, 45 Cal.3d at p. 735.)  The meaning "may not be determined from a single word or sentence; the words must be construed in context." (*Ibid.*)

Where the language is ambiguous, we may consult legislative history as well as "any contemporaneous constructions of the constitutional provision made by the Legislature or by administrative agencies." (*City and County of San Francisco v. County of San Mateo* (1995) 10 Cal.4th 554, 563 (*San Mateo*), citing *Board of Supervisors v. Lonergan* (1980) 27 Cal.3d 855, 866.)  "In choosing between alternative interpretations of constitutional provisions we are further constrained by our duty to harmonize various constitutional provisions." (*San Mateo*, *supra*, at p. 563, citing *Serrano v. Priest* (1971) 5 Cal.3d 584, 596.)

## C. Overview of utility property taxation in California

We begin with a general overview of California's utility property tax system.  In *ITT*, the California Supreme Court provided a thorough summary of that system, as it stood in 1985, which we quote here:

"In 1935 the current system of ad valorem unit taxation of public utility property, now defined by article XIII, section 19, of the California Constitution and Revenue and Taxation Code section 721 et seq., came into effect.  Under this system all property, other than franchises, owned or used by public utilities is annually assessed and subjected to taxation.  (Art. XIII, § 19; §§ 721-722, 755-756.)  Under the system that had prevailed from 1910 into the 1930's, there was a separation of sources of tax revenue:  public utility property was subject to a special gross receipts 'in lieu' tax levied and collected by the state to support state government, and other property was subject to the regular ad valorem property tax levied and collected by local government to support itself.  (Bertane, *The Assessment of Public Utility Property in California* (1973) 20 UCLA L.Rev. 419, 423-424 (hereinafter Bertane, *Public Utility Property*).)

"By the early 1930's, however, the Great Depression had brought about a crisis in taxation as in other aspects of public and private life, and there arose general dissatisfaction with this system of taxation.  Local tax rates were believed to be too high, in part because public utility property was not on the local tax rolls; state revenues were believed to be too low, in part because public utility tax rolls could be raised only by a two-thirds vote of the Legislature . . . and the public utilities possessed sufficient political power to block such tax increases [citation].  In the face of this crisis, the Legislature drafted and the voters adopted an amendment to the Constitution known as the Riley-Stewart Plan, which completely revised this system of taxation.  The special gross receipts 'in lieu' tax was repealed and public utility property was subjected to the regular ad valorem property tax, thus restoring public utility values to the local tax rolls and alleviating the local tax burden; the political problems inherent in taxing public utilities at

8

the state level pursuant to legislatively set rates were eliminated by having public utility property centrally assessed by the Board.

"One of the primary objectives of the system of unit taxation of public utility property is to ascertain and reach with the taxing power the entire real value of such property. [Citations.] It has long been recognized that 'public utility property cannot be regarded as merely land, buildings, and other assets. Rather, its value depends on the interrelation and operation of the entire utility as a unit. Many of the separate assets would be practically valueless without the rest of the system. Ten miles of telephone wire or one specially designed turbine would have a questionable value, other than as scrap, without the benefit of the rest of the system as a whole.' (Bertane, *Public Utility Property*, *supra*, at p. 433.) Unit taxation prevents real but intangible value from escaping assessment and taxation by treating public utility property as a whole, undifferentiated into separate assets (land, buildings, vehicles, etc.) or even separate kinds of assets (realty or personalty).

"The unit taxation of public utility property is effected in four general stages. First, the Board annually assesses all unitary property of each public utility, that is, all property that it uses in performing its function. (§ 723.) In making this assessment, the Board uses the principle of unit valuation: it determines the value of the property as a whole, rather than the value of any of the assets as parts of the whole; it does not assess each asset and then total up the valuation, but values the property as a unit, primarily through a capitalized earnings approach. Second, the owner of the public utility property is offered an opportunity to apply for corrections. (§§ 731, 741-749.) Third, the Board transmits to the local taxing authority a roll showing the assessments against public utility property situated within its jurisdiction. (§§ 755-756, 758.) In accordance with the principle of unit valuation, such assessments do not represent the value of the assets situated within that jurisdiction; rather, they represent the share of the value of the property as a whole that the Board has determined should equitably be allocated to the

9

jurisdiction. Thus, after it has assessed the value of the property as a whole, the Board makes a formulary allocation that has little or no relationship to the actual fair market value of the particular assets situated within the jurisdiction. Fourth, the local taxing authority subjects the property so assessed to taxation at the rate fixed in its jurisdiction. (See §§ 755-756.)" (*ITT*, *supra*, 37 Cal.3d at pp. 862-864, fns. omitted; see also *Sprint Telephony PCS*, *L.P. v. Board of Equalization* (2015) 238 Cal.App.4th 871, 878 [SBOE responsible for assessing property at statewide level; individual counties responsible for collecting taxes].)

It is the fourth stage—fixing the rate in the jurisdiction—that is at issue here. Under the current system, property may be subject to two tax components: (1) a general levy of no more than 1 percent of the full cash value, and (2) a debt-service component sufficient to pay interest and principal on voter-approved indebtedness. (Cal. Const., art. XIII A, § 1, subds. (a), (b).)

Article XIII A, section 1, subdivision (a) of the California Constitution, part of the 1978 initiative commonly referred to as Proposition 13, provides that "[t]he maximum amount of any ad valorem tax on real property shall not exceed One percent (1%) of the full cash value of such property. The one percent (1%) tax to be collected by the counties and apportioned according to law to the districts within the counties."[8] (Cal. Const., art. XIII A, § 1, subd. (a).) Subdivision (b) of that section provides that the 1 percent cap in subdivision (a) shall not apply to ad valorem taxes or special assessments to pay certain interest and redemption charges specified in the subdivision, consisting chiefly of bonded indebtedness. (Cal. Const., art. XIII A, § 1, subd. (b).)

---

[8] Proposition 13 contained four major elements: "a real property tax rate limitation ([Cal. Const.,] art. XIII A, § 1), a real property assessment limitation ([Cal. Const.,] art. XIII A, § 2), a restriction on state taxes ([Cal. Const.,] art. XIII A, § 3) and a restriction on local taxes ([Cal. Const.,] art. XIII A, § 4)." (*City of Rancho Cucamonga v. Mackzum* (1991) 228 Cal.App.3d 929, 936, fn. omitted.)

The Legislature has subsequently enacted statutes that specify certain formulas for calculating the debt-service component of property on the secured tax rolls.[9]  Under section 100(b), state-assessed property, such as that of the utilities here, "shall be taxed at a rate equal to the sum of the following two rates: [¶] (1) A rate determined by dividing the county's total ad valorem tax levies for the secured roll, including levies made pursuant to Section 96.8, for the prior year, exclusive of levies for debt service, by the county's total ad valorem secured roll assessed value for the prior year. [¶] (2) A rate determined as follows: [¶] (A) By dividing the county's total ad valorem tax levies for unitary and operating nonunitary property for the prior year debt service only by the county's total unitary and operating nonunitary assessed value for the prior year. [¶] (B) Beginning with the 1989-90 fiscal year, adjusting the rate determined pursuant to subparagraph (A) by the percentage change between the two preceding fiscal years in the county's ad valorem debt service levy for the secured roll, not including unitary and operating nonunitary debt service."  (§ 100(b).)

In other words, the debt-service rate "is calculated as the previous year's unitary debt service rate . . . multiplied by the percentage change between the two preceding fiscal years in the county's ad valorem debt service *levy* (not rate) for the secured roll. [Citation.]  The formula for the second component means that the unitary rate is based on the change in absolute dollars of the county's debt service rate, not changes in the percentage that taxpayers are paying."  (*BNSF Railway Company v. County of Alameda* (9th Cir. 2021) 7 F.4th 874, 881-882 (*BNSF*).)

By contrast, the debt-service component tax rate for locally assessed property is "the amount needed as a percentage of property values to produce enough revenue to

_____

[9] "The 'secured roll' is that part of the roll containing State assessed property and property the taxes on which are a lien on real property sufficient, in the opinion of the assessor, to secure payment of the taxes.  The remainder of the roll is the 'unsecured roll.' "  (§ 109.)

11

make payments for the interest and principal on all voter-approved bonded indebtedness issued by any of the various local entities" in the tax rate area to which the property is assigned. (*BNSF*, *supra*, 7 F.4th at p. 880, citing § 93.)

A tax rate area is " 'a specific geographic area all of which is within the jurisdiction of the same combination of local agencies and school entities for the current fiscal year.' " (*City of Dinuba v. County of Tulare* (2007) 41 Cal.4th 859, 866; § 95, subd. (g).) "Property tax revenue from parcels assigned to a certain tax rate area is allocated by the county to the local agencies having jurisdiction in the tax rate area." (*City of Dinuba*, *supra*, at p. 866; § 96.1, subd. (a)(1).) Under this system, a "county may have hundreds or thousands" of tax rate areas. (*BNSF*, *supra*, 7 F.4th at p. 880.)

The Legislature enacted section 100—formerly section 98.9—in 1986, in part to address the administrative burden that this tax system created for state-assessed unitary property and entities like the utilities that would receive potentially hundreds or thousands of tax bills from the various tax rate areas within a county, at varying rates. (*BNSF*, *supra*, 7 F.4th at pp. 880-881 & fn. 5.) Section 100 provides that state-assessed property shall be subject to a single countywide tax rate area: "Each county shall establish one countywide tax rate area. The assessed value of all unitary and operating nonunitary property shall be assigned to this tax rate area. No other property shall be assigned to this tax rate area." (§ 100, subd. (a).)

### D. *Requests for judicial notice and motion to strike*

The County requests judicial notice of legislative history materials related to Assembly Bill No. 454 (1987-1988 Reg. Session), which amended former section 98.9, the predecessor to section 100.[10] In addition, the utilities request judicial notice of:

_____

[10] We previously granted the County's request for judicial notice of: (1) legislative analysis of former article XIII, section 14, of the California Constitution, entitled "A Plan for Tax Relief—Senate Constitutional Amendment No. 30, to be Submitted to the Voters for their Approval as Proposition No. 1 on the Ballot at a Special (continued)

(1) a "Brief of Amici Curiae in Support of Respondents, filed by various California counties" in the *ITT* case; (2) a copy of the SBOE's chart of net assessed values by county; and (3) a copy of the County of Santa Clara Compilation of Tax Rates and Information for fiscal year 2020 to 2021.

We deny the requests because the materials are not necessary for our resolution of the matter.  (*San Diego City Firefighters*, *Local 145 v. Board of Admin. of San Diego City Employees Ret. Sys.* (2012) 206 Cal.App.4th 594, 600, fn. 3.)  The narrow legal question before us is whether article XIII, section 19, mandates that utility property be taxed at the same rate as other property.  If it does, the County's application of different rates to the utilities' property and other property, pursuant to section 100(b), is unconstitutional.

As we explain below, we are able to resolve that question without resort to the above-referenced materials.[11]

### E.  *Article XIII*, *section 19*, *does not mandate that utility property be taxed at the same rate as other property*

#### 1.  *Plain language*

As noted above, we begin with the plain language of the constitutional provision at issue.[12]  (*Delaney*, *supra*, 50 Cal.3d at p. 798.)  Article XIII, section 19, provides in

---

Election on Tuesday, June 27, 1933"; and (2) article XIII of the California Constitution, as amended and in force on September 15, 1935.

[11] The utilities also move to strike a portion of the County's reply brief, on the ground that it raised new arguments not contained in its petition.  Specifically, the utilities contend the County argues for the first time on reply that, "in adopting a countywide method of taxing utility property in Section 100, AB 454 created rates for utility property that 'differ in numerous ways from the tax rates applied to locally assessed property.' "  We disagree that the argument is new.  The County adequately presented that argument in its petition when it stated, for instance, that, "however these *countywide* rates for utility property are calculated, they always differ—by definition—from the rates that apply to locally assessed property, which are calculated by local taxing district—not on a countywide basis."  We deny the motion.

[12] The utilities argue we should begin with the California Supreme Court's decision in *ITT*, which they claim compels a ruling in their favor, and obviates the need (continued)

13

pertinent part: "The Board shall annually assess (1) pipelines, flumes, canals, ditches, and aqueducts lying within 2 or more counties and (2) property, except franchises, owned or used by regulated railway, telegraph, or telephone companies, car companies operating on railways in the State, and companies transmitting or selling gas or electricity. This property shall be subject to taxation to the same extent and in the same manner as other property. [¶] No other tax or license charge may be imposed on these companies which differs from that imposed on mercantile, manufacturing, and other business corporations."[13]  (Art. XIII, § 19.)

The chief disagreement between the parties centers on the meaning of the second sentence: "This property shall be subject to taxation to the same extent and in the same manner as other property."  The utilities contend the phrase "to the same extent" means "at the same tax rate," while the County contends it means that utility property must be subject to taxation after being assessed to capture its full value as a statewide unit.

We cannot conclude that this language is clear and unambiguous on its face. (*Delaney*, *supra*, 50 Cal.3d at p. 798.)  While the utilities' proffered construction is a reasonable interpretation of the plain language, the section does not actually say "at the same rate."  We must assume that the drafters' choice of words "was not an idle act." (*County of Alameda v. Workers' Comp. Appeals Bd*. (2013) 213 Cal.App.4th 278, 285.) If the voters had intended for article XIII, section 19, to mandate application of the same tax rate, we presume they would have said so.  (*Regency Outdoor Advertising*, *Inc*. *v. City of Los Angeles* (2006) 39 Cal.4th 507, 529-530; *Bighorn-Desert View Water Agency v.*

---

for us to interpret article XIII, section 19, at all.  We disagree with the utilities' reading of *ITT*, which we address below after interpreting article XIII, section 19.  In any event, we must start "in every case of constitutional construction with the language of the provision."  (*ITT*, *supra*, 37 Cal.3d at p. 866, citing *Los Angeles County Transportation Commission v. Richmond* (1982) 31 Cal.3d 197, 205.)

[13] Where appropriate, we refer to these first three sentences of article XIII, section 19, as the "first," "second" and "third" sentences of the section, respectively.

14

*Verjil* (2006) 39 Cal.4th 205, 212 (*Bighorn*) ["When interpreting a provision of our state Constitution, our aim is 'to determine and effectuate the intent of those who enacted the constitutional provision at issue.' "].)

In short, it is unclear what the phrase "to the same extent and in the same manner" means as used in article XIII, section 19, without considering the broader context and legislative history.

### 2. *Context and legislative history*

In construing a constitutional provision, we must do so in its broader context and we must harmonize various provisions. (*Professional Engineers in California Government v. Kempton* (2007) 40 Cal.4th 1016, 1037; *San Mateo*, *supra*, 10 Cal.4th at p. 563.) We may also consult legislative history as well as "any contemporaneous constructions of the constitutional provision made by the Legislature or by administrative agencies." (*San Mateo*, *supra*, at p. 563.) Viewing the phrase "to the same extent and in the same manner" in the broader context of article XIII of the California Constitution as a whole, and considering the legislative history of section 19, it becomes apparent that the drafters did not intend for the phrase to mean "at the same rate."

The third sentence of article XIII, section 19, suggests the section as a whole contemplates that the rates applied to state-assessed utility property may differ from those applied to other property. That sentence reads: "No other tax or license charge may be imposed on these companies which differs from that imposed on mercantile, manufacturing, and other business corporations." (Art. XIII, § 19.) That provision means that "each specific tax or license imposed on utilities must not differ from the specific tax or license imposed on mercantile, manufacturing and other comparable businesses corporations." (*Pacific Gas & Electric Co. v. City of Oakland* (2002) 103 Cal.App.4th 364, 372 [city's imposition of business tax on Pacific Gas & Electric at higher rate than on retail and other businesses violated art. XIII, § 19]; see also *City of Oceanside v. Pacific Telephone & Telegraph Co.* (1955) 134 Cal.App.2d 361.) In other

15

words, the third sentence applies to taxes or licenses imposed on the utility *companies* themselves.  By contrast, the first two sentences of article XIII, section 19, pertain to assessment and taxation of utility *property*, and provide that the SBOE shall annually assess such property and that it shall then "be subject to taxation to the same extent and in the same manner as other property."  (Art. XIII, § 19.)  The second sentence does not say, as the third sentence does, that the taxes or rates must not differ.

Similarly, the statement that no "*other* tax or license charge may be imposed on these companies which differs . . ." (art. XIII, § 19, italics added) further suggests that, by contrast, a property tax imposed on the state-assessed property of those companies may differ.  Consistent with this distinction, the second sentence provides that state-assessed property shall be "*subject to taxation* to the same extent and in the same manner."  (Art. XIII, § 19, italics added.)  It does not say that such property "*shall be taxed* to the same extent and in the same manner."  In other words, it describes the condition of such property after the assessment, or valuation, stage, which precedes the separate taxation stage.  (*ITT*, *supra*, 37 Cal.3d at pp. 863-864.)

The utilities contend that the first sentence of article XIII, section 19, dictates how valuation occurs, while the second sentence refers "to the post-valuation process, i.e., when counties apply tax rates to the property and bill the taxpayer."  For that reason, they argue, " 'subject to taxation to the same extent and in the same manner as other property' must refer to the post-valuation process, i.e., when counties apply tax rates to the property and bill the taxpayer," and " 'to the same extent' " logically refers to the rate of tax.  However, even if the first two sentences fit within the dichotomy the utilities describe, it does not follow that article XIII, section 19, mandates that *every aspect* of the post-valuation taxation process (including rates imposed) be uniform.  As we have explained, the language describes the extent to which the property shall be subject to taxation, rather than the extent to which it shall be taxed.

16

The utilities also contend that even if the third sentence—"no other tax or license charge may be imposed on these companies which differs from that imposed on [other businesses]"—is accepted as meaning that property taxes can differ between utilities and other taxpayers, the first sentence expressly establishes the scope of that difference, which is limited to valuation. However, the first sentence establishes that utility property will be assessed by the SBOE; that difference in the manner of valuation does not preclude there also being a difference in the rate of taxation. The utilities' theory that there can be only one difference in how utility property is treated as compared to other property is unsupported.

The language of section 11, subdivision (f), of article XIII of the California Constitution—part of the same 1974 enactment that made non-substantive revisions to section 19—also demonstrates that the drafters recognized the distinction between being "subject to taxation" and actually being taxed. That section provides that "[a]ny taxable interest of any character, other than a lease for agricultural purposes and an interest of a local government, in any land owned by a local government that is *subject to taxation* pursuant to Section 11(a) of this Article *shall be taxed* in the same manner as other taxable interests." (Cal. Const., art. XIII, § 11, subd. (f), italics added.) The two phrases plainly do not mean the same thing in the context of section 11; it follows that "subject to taxation" in section 19 does not mean "shall be taxed." (*Bighorn*, *supra*, 39 Cal.4th at p. 213 ["when a word has been used in different parts of a single enactment, courts normally infer that the word was intended to have the same meaning throughout"]; *People v. Gray* (2014) 58 Cal.4th 901, 906.)[14]

---

[14] The Legislature has also used the phrase "shall be taxed at the same rate" in other contexts. (See, e.g., §§ 5391 ["aircraft subject to this part shall be taxed at the same rate and in the same manner as all other personal property"], 1154, subd. (c) ["Such aircraft shall be taxed at the same rate and in the same manner as all other property on the unsecured roll"].) The contrast between the language in these sections—"shall be taxed at the same rate"—and the language in article XIII, section 19—"shall be subject to (continued)

17

The legislative history of article XIII, section 19, supports this interpretation. As referenced above, voters revised much of article XIII via proposition in 1974, including section 19, which was formerly section 14. (*ITT*, *supra*, 37 Cal.3d at p. 870, fn. 6.) Because the changes to section 19 were non-substantive, "the original language and the extrinsic aids relevant to construing it are also relevant to construing the present language." (*ITT*, *supra*, at p. 870, fn. 6.)

The language in former section 14 regarding other taxes and licenses provided as follows: "All companies herein mentioned and their franchises, other than insurance companies and their franchises, shall be taxed in the same manner and at the same rates as mercantile, manufacturing and business corporations and their franchises are taxed pursuant to section 16 of this article; provided, that nothing herein shall be construed to release any company mentioned in this section from the payment of any amount agreed to be paid or required by law to be paid for any special privilege or franchise granted by any political subdivision or municipality of this State; provided, further, that no excise or income tax or any other form of tax or license charge shall be levied or assessed upon or collected from the companies, or any of them, mentioned in the first paragraph of this section, in any manner or form, different from, or at a higher rate than that imposed upon or collected from mercantile, manufacturing and business corporations doing business within this State." (Cal. Const., former art. XIII, § 14.)

Former section 14 thus expressly directed that the companies mentioned therein, including the utilities, shall be taxed in the same manner and *at the same rates* as the other listed types of business. (Cal. Const., former art. XIII, § 14.) By contrast, former section 14 provided that the state-assessed property of those companies is "subject to taxation to the same extent and in the same manner." (Cal. Const., former art. XIII,

taxation to the same extent and in the same manner"—suggests they have different meanings.

18

§ 14.)  We must presume the drafters intended that these different phrases have different meanings.  (*People v. Valencia* (2017) 3 Cal.5th 347, 357 [court must accord significance to every word, phrase and sentence, if possible; construction making some words surplusage is to be avoided].)

As the County persuasively argues, "by expressly limiting that requirement [that imposed taxes not differ] to *other* types of taxes (e.g., sales and income taxes), the second paragraph confirms that section 19's first paragraph imposes no similar limitation on the taxation of utility *property*."

Additional legislative history demonstrates that the purpose of article XIII, section 19, had nothing to do with mandating equal tax rates, but instead was to "restor[e] public utility values to the local tax rolls and alleviat[e] the local tax burden."  (*ITT*, *supra*, 37 Cal.3d at p. 863.)  As the California Supreme Court has explained, "[o]ne of the primary objectives of the system of unit taxation of public utility property is to ascertain and reach with the taxing power the entire real value of such property."  (*Ibid*., citing Plan for Tax Relief presented in Sen. Const. Amend. No. 30 and Assem. Const. Amend. No. 68 to be Submitted as Prop. 1 on Ballot of June 27, 1933, p. 8 (Plan for Tax Relief[15]); Bertane, *Public Utility Property*, *supra*, at pp. 419, 423-424, 433.)

The Plan for Tax Relief explained that "[u]nder the proposed constitutional provision (Sec. 14, Art. XIII) this uncertainty with reference to the valuation of utility property will be removed.  All such property will be centrally valued by the State Board of Equalization and apportionment made to the several localities so that it may be entered upon county and city assessment rolls at adequate valuations.  This is the system in almost universal use throughout the United States and is recognized as the most effective method of meeting the tax problems involved."  (Plan for Tax Relief, p. 10.)

---

[15] The Plan for Tax Relief was the Legislature's official analysis of former article XIII, section 14, of the California Constitution.

Further, the Plan for Tax Relief stated that the proposed provision would "[a]bandon[] . . . the present separation of sources of State and local revenues by returning utility property to the local tax rolls to be taxed in the same way that other property is taxed, thereby broadening the local tax base by one-sixth, with corresponding tax reduction for the common property owner, and consolidating all taxpayers into a cohesive group whose interests are identical." (Plan for Tax Relief, p. 6.) In addition, the provision would "[a]ssure[] adequate valuation of utility property by providing for its central assessment by the State Board of Equalization with full apportionment back to the several localities where the property is situated." (*Ibid*.)

By contrast, the Plan for Tax Relief said nothing about imposing identical tax rates on utility property. The utilities rely on the following language in the legislative analysis: "By amending the Constitution (Sec. 14, Art. XIII) this plan would provide, effective January 1, 1935, that all utility property would be returned to the local rolls, liable to the same taxation as other property." (Plan for Tax Relief, p. 11.) They contend this language means utility property would be taxed at the same rate. But nothing in the Plan for Tax Relief indicates an intent or need to tax utility property at the identical rate applied to other property. The utilities declare that "[i]t defies logic to interpret the statement that 'be taxed in the same way that other property is' " as not including the applicable tax rates. We are not persuaded, though, given the purposes of the constitutional amendment stated at the time of its enactment.

Viewed in light of this legislative history, the language "to the same extent as" in article XIII, section 19 appears to mean that, after such utility property is assessed by the SBOE, it shall be subject to ad valorem taxation at its full market value, rather than via the previous method of gross receipts in-lieu taxation that failed to capture its full value adequately and contributed to the local tax burden. Similarly, the language "in the same manner as" appears to mean that, after the utility property is assessed by the SBOE, it

20

shall be subject to taxation by the local jurisdictions just as other property is, rather than by the state, as it had been previously.

As the California Supreme Court explained, the existing problems were remedied by having the state assess utility property statewide as a going concern to capture its value fully, and then allowing the local jurisdictions to levy and collect taxes on that value to bolster the local tax rolls and relieve the burden on other local taxpayers. (*ITT*, *supra*, 37 Cal.3d at p. 863 ["special gross receipts 'in lieu' tax was repealed and public utility property was subjected to the regular ad valorem property tax, thus restoring public utility values to the local tax rolls and alleviating the local tax burden [and] the political problems inherent in taxing public utilities at the state level pursuant to legislatively set rates were eliminated by having public utility property centrally assessed by the Board"].)

Mandating application of identical tax rates was not necessary to address those problems, and there is no evidence in the legislative history or elsewhere that it was intended or considered.

The utilities argue that this interpretation of "to the same extent" would be redundant of article XIII, section 1, of the California Constitution which provides: "Unless otherwise provided by this Constitution or the laws of the United States: [¶] (a) All property is taxable and shall be assessed at the same percentage of fair market value. When a value standard other than fair market value is prescribed by this Constitution or by statute authorized by this Constitution, the same percentage shall be applied to determine the assessed value. The value to which the percentage is applied, whether it be the fair market value or not, shall be known for property tax purposes as the full value. [¶] (b) All property so assessed shall be taxed in proportion to its full value." (Cal. Const., art. XIII, § 1.) They claim that interpreting "to the same extent as" in article XIII, section 19, to mean "subject to ad valorem taxation at its full market value," would render it surplusage in violation of maxims of constitutional interpretation.

21

We disagree. It is true that article XIII, section 1 of the California Constitution, "establishes the general rule that property taxes in California must be ad valorem." (*City & County of San Francisco v. All Persons Interested in the Matter of Proposition G* (2021) 66 Cal.App.5th 1058, 1076, citing *City of Oakland v. Digre* (1988) 205 Cal.App.3d 99, 110.) However, the language in article XIII, section 19, specifies that utility property henceforth will be subject to taxation at its full market value, after being assessed by the state, which is contrary to the previous system. We do not view that language in section 19 as redundant or surplusage of section 1, especially in light of the context of the enactment of section 19, which effected a complete revision of California's utility property taxation system. (*ITT, supra*, 37 Cal.3d at p. 863.)

Although the utilities advance these various textual arguments, their primary support for their interpretation of article XIII, section 19, derives from language in *ITT*. In that decision, the California Supreme Court stated: "By requiring that public utility property be 'subject to taxation to the same extent and in the same manner as other property,' article XIII, section 19, does not impose a requirement of equal valuation between public utility and other property, but simply specifies that public utility property, after it has been placed on the local tax rolls, be levied on at the same *rate* as locally assessed property, instead of being subject to a special gross receipts 'in lieu' tax." (*ITT, supra*, 37 Cal.3d at p. 870.)

We do not agree with the utilities that this sentence in *ITT* interpreted article XIII, section 19, to preclude the imposition of different debt-service tax rates on utility property, thereby rendering section 100(b) unconstitutional. In *ITT*, the California Supreme Court was considering the assessment of property, rather than taxation rates. (*ITT, supra*, 37 Cal.3d 859.) The California Supreme Court was not asked to—and did not—analyze or interpret the relevant language in article XIII, section 19. (*ITT, supra*, at p. 862.) Nor did it examine the constitutionality of section 100(b), a statute that had not been enacted when the decision was issued. (*ITT, supra*, at p. 862.) As cases are not

authority for propositions not considered, we decide that the language in *ITT* upon which the utilities rely is dicta and does not determine the resolution of the question before us. (*People v. Baker* (2021) 10 Cal.5th 1044, 1109; *Sonic-Calabasas A*, *Inc*. *v*. *Moreno* (2013) 57 Cal.4th 1109, 1158 [dicta consists of observations and statements unnecessary to the appellate court's resolution of the case].)

We have reviewed the other authorities cited by the utilities in support of their interpretation of article XIII, section 19. (See *Southern California Telephone Company v. County of Los Angeles* (1941) 45 Cal.App.2d 111; *Independent Energy Producers Association*, *Inc*. *v*. *State Bd*. *of Equalization* (2004) 125 Cal.App.4th 425; *Los Angeles SMSA Ltd*. *Partnership v*. *State Board of Equalization* (1992) 11 Cal.App.4th 768.) Like *ITT*, these cases did not consider the issue of taxation rates, and therefore we conclude they do not assist the utilities here.

We recognize the force of the utilities' arguments that the tax rates set out by section 100(b) ask them to pay a disproportionate share of the debt burden of certain counties in California. The remedy for such disparate treatment, however, lies with the Legislature. Article XIII, section 19, does not preclude imposition of different rates and does not render section 100(b) unconstitutional.

### F. *The demurrers must be sustained without leave to amend*

Our conclusion that article XIII, section 19, does not preclude the imposition of different tax rates on utility property versus other property necessitates that the County's demurrers be sustained.

The complaints allege a single cause of action for tax refunds pursuant to section 5140. That cause of action is entirely predicated on the allegation that the County's imposition of higher tax rates on the utilities' property than on other property, pursuant to section 100(b), violates article XIII, section 19. Because we determine that the imposition of higher taxes on the utilities' property does not violate article XIII,

23

section 19, the cause of action cannot state a claim for relief.  (Code Civ. Proc., § 430.10, subd. (e).)

The demurrers must also be sustained without leave to amend.  (*City of Stockton v. Superior Court*, *supra*, 42 Cal.4th at p. 747, citing *San Diego Gas & Electric Co. v. Superior Court* (1996) 13 Cal.4th 893, 913.)  Resolution of the legal issue here forecloses the possibility that the utilities could supply necessary factual allegations.  (*People ex rel. Dept. of Transportation v. Superior Court* (1992) 5 Cal.App.4th 1480, 1486.)

### III.   DISPOSITION

Let a peremptory writ of mandate issue directing respondent court to vacate its order overruling the demurrers and to enter a new order sustaining the demurrers without leave to amend.  Upon issuance of the remittitur, the temporary stay is vacated.  Costs in this original proceeding are awarded to the County.

_____
                         Wilson, J.

WE CONCUR:


_____
      Greenwood, P.J.


_____
      Danner, J.


<u>County of Santa Clara v. Superior Court of Santa Clara County (AT&T Mobility et al.)</u>
H049161

| | |
|---|---|
| Trial Court: | Santa Clara County Superior Court<br>Superior Court Nos. 20CV363802,<br>     20CV363804, 20CV363806 |
| Trial Judge: | Hon. William J. Monahan |
| Counsel for Petitioner: | James R. Williams, County Counsel<br>Douglas M. Press<br>Assistant County Counsel<br>Steve Mitra<br>Assistant County Counsel<br>Mark F. Bernal<br>Deputy County Counsel<br>Ward A. Penfold<br>Deputy County Counsel<br>Laura S. Trice<br>Deputy County Counsel |
| Counsel for Real Parties in Interest: | California Appellate Law Group<br>Rex S. Heinke<br>Jessica M. Weisel<br><br>Boersch & Illovsky<br>Martha A. Boersch<br>Matthew C. Dirkes<br><br>Capitol Law and Policy<br>Eric J. Miethke |
| Counsel for Respondent:<br>Superior Court of Santa Clara County | No brief filed |
| Counsel for Amicus Curiae BNSF<br>Railway Company, In Support of Real<br>Parties in Interest | Munger, Tolles & Olson<br>Benjamin J. Horwich |

County of Santa Clara v. Superior Court of Santa Clara County (AT&T Mobility et al.)
H049161